FILED

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

2009 AUG 17 P 1:00

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | | |
|---|---|---|
| **ALLEGRA NETWORK LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | Civil Action No. _1:09cv912_ |
| | ) | _LO/TCB_ |
| **MICHAEL J. REEDER** | ) | |
| Serve: | ) | |
| Eric M. Persian, Esq. | ) | |
| Sheridan, Persian & Assoc., PLLC | ) | |
| 10550 Linden Lake Plaza, Ste. 300 | ) | |
| Manassas, Virginia 20109 | ) | |
| epersian@dsp-law.com | ) | |
| | ) | |
| **AND** | ) | |
| | ) | |
| **JEFFREY L. REEDER,** | ) | |
| Serve: | ) | |
| Eric M. Persian, Esq. | ) | |
| Sheridan, Persian & Assoc., PLLC | ) | |
| 10550 Linden Lake Plaza, Ste. 300 | ) | |
| Manassas, Virginia 20109 | ) | |
| epersian@dsp-law.com | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff Allegra Network LLC ("Allegra"), by it attorneys, and for its Complaint for

Injunctive Relief and Damages ("Complaint") against defendants Michael J. Reeder and Jeffrey

L. Reeder states as follows:

## NATURE OF THE CASE

1.      This is an action for preliminary and permanent injunctive relief and damages brought to enjoin and to seek redress for defendants' unauthorized relocation of their franchised Allegra Print & Imaging center in violation of the franchise agreement entered into by Allegra and defendants (the "Franchise Agreement," a true and correct copy of which is attached hereto as Exhibit A.) Under the Franchise Agreement, Allegra granted defendants a limited license to operate a franchised Allegra Print & Imaging center at a specific, approved location in Washington, D.C., and to use Allegra's propriety names and marks, including its federally-registered trademarks, in connection therewith. Without Allegra's approval and in violation of the express terms of their Franchise Agreement, defendants abandoned their approved Allegra Print & Imaging center location in Washington, D.C. and moved the center to a new, unapproved location in Virginia that is within a two mile radius of another Allegra franchisee. Defendants have also failed to pay Allegra amounts due and owing under the Franchise Agreement.

2.      Defendants' unauthorized use of Allegra's trade names and trademarks in connection with their operation of a print and imaging center at an unapproved location constitutes trademark infringement and unfair competition under state and federal law, and warrants issuance of preliminary and permanent injunctive relief to enjoin defendants' misconduct. Defendants' abandonment of their approved franchise location, their establishment of a new print and imaging center at an unapproved location, and their failure to pay amounts due and owing to Allegra constitute material breaches of their Franchise Agreement. As set forth in detail in the Complaint, Allegra has been and, unless the injunctive relief sought herein issues, shall continue to be, irreparably harmed by defendants' misconduct. Moreover, Allegra has sustained substantial damages by reason of defendants' misconduct.

2

3.     This action is brought to secure the preliminary and permanent injunctive relief necessary to enjoin defendants' misconduct and to recover the damages sustained by Allegra by reason of that misconduct.

## PARTIES

4.     Allegra is a Michigan limited liability company with its principal place of business in Northville, Michigan. Allegra is the franchisor of several famous digital print and imaging brands, including American Speedy® Printing Centers, Allegra® Print & Imaging Centers, Insty Prints®, and Signs Now®. None of Allegra's members is a citizen or resident of Virginia.

5.     Defendant Michael J. Reeder is a citizen and resident of the Commonwealth of Virginia.

6.     Defendant Jeffrey L. Reeder is a citizen and resident of the Commonwealth of Virginia.

## JURISDICTION AND VENUE

7.     This Court has original subject matter jurisdiction of this action under 28 U.S.C. § 1332, in that this is a civil action where the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States. This Court also has subject matter jurisdiction under 28 U.S.C. § 1331, 1338 and 1367, in that this is a civil action involving claims arising under the laws of the United States, including an Act of Congress relating to trademarks, and wherein all other claims are so related to claims within the Court's original jurisdiction that they form part of the same case or controversy.

8.    Venue is proper in this judicial district under 28 U.S.C. § 1391, in that a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this judicial district.

## THE ALLEGRA MARKS

9.    To identify the source, origin and sponsorship of its brand of information processing systems, rapid copying and printing products and services, and to distinguish those products and services from those established, made, offered and sold by others, Allegra and its authorized franchisees have extensively used certain trademarks, service marks, trade names, logos, emblems and indicia of origin, including but not limited to the Allegra® Print & Imaging mark (the "Allegra Marks"), in connection with the operation of authorized Allegra Print & Imaging centers.

10.    The Allegra Marks are registered on the Principal Register of the United States Patent and Trademark Office. The registration of the Allegra Marks continues in full force and effect.

11.    Allegra has given notice to the public of the registration of the Allegra Marks as provided in 15 U.S.C. § 1111 and complies with all legal requirements to ensure that it and its authorized licensees remain the exclusive users of the Allegra Marks.

12.    Allegra and its authorized franchisees have continuously used the Allegra Marks in interstate commerce in connection with the promotion, sale and franchising of Allegra Print & Imaging centers and the promotion and sale of the digital print and imaging products and services they offer throughout the United States, since the date of their registration.

13.    Pursuant to franchise agreements entered into by and between Allegra and its authorized franchisees, Allegra grants franchises to qualified persons to own and operate Allegra

4

Print & Imaging centers, together with a limited license to use the Allegra Marks in connection therewith, but only in such manner and at such locations as are expressly authorized by Allegra in the Franchise Agreement.

14.     Allegra and its authorized franchisees have extensively advertised and promoted the Allegra Marks and the products and services they offer under the Allegra brand throughout the United States and through various media.  As a result of such efforts and the considerable money spent in connection therewith, the products offered by Allegra and its authorized franchisees under the Allegra Marks have met with widespread public approval and have established demand and goodwill among consumers throughout the United States.

## REVEVANT FACTS

15.     Allegra and defendants entered into the Franchise Agreement on November 14, 2005.  Pursuant to the Franchise Agreement, defendants were granted a franchise to establish and operate an Allegra Print & Imaging center at an approved location in Washington, D.C., and a license to use the Allegra Marks in connection therewith, for a defined term of years.

16.     Under the Franchise Agreement, defendants agreed to pay to Allegra a monthly royalty in an amount equal to a specified percentage of sales, and to make monthly contributions to Allegra's marketing fund.

17.     Under the Franchise Agreement, Allegra has the right and authority to approve any change of location of a franchised Allegra Print & Imaging center, including the center operated by defendants.  Allegra also has the right to approve any lease for the operation of an Allegra Print & Imaging center, including the center operated by defendants.

18.     The Franchise Agreement contains a covenant against competition prohibiting defendants from operating any competitive business within a ten (10) mile radius of the

defendants' former center and/or within a five (5) mile radius of any other center, for a two (2) year period following expiration or termination of the Franchise Agreement.

19.     In or about July 2009, defendants failed to renew their lease for their franchised Allegra Print & Imaging center location in Washington, D.C.

20.     Defendants informed Allegra of their failure to renew their lease for their center in July 2009 and informed Allegra that they were seeking a new lease for a center in Virginia.

21.     On July 29, 2009, Allegra informed defendants in writing that defendants' proposed Virginia location was not acceptable to Allegra, because defendants' proposed Virginia location was within a two mile radius of an existing Insty-Prints center.   Allegra specifically advised defendants that if they proceeded with the lease on the unapproved Virginia location, they would be in material default under the Franchise Agreement.  Allegra informed defendants that should they proceed to relocate their center to the unapproved Virginia location and fail to cure that default within 30 days of written notice of default, Allegra may terminate the Franchise Agreement for cause.

22.     Notwithstanding their obligations under the Franchise Agreement and Allegra's July 29, 2009 letter, defendants abandoned their center, established a new print and imaging center at an unapproved location in Virginia, and are using the Allegra Marks in connection with the operation of that unapproved center, all in violation of the Franchise Agreement.

23.     In addition to defendants' unauthorized relocation, since November 2007, defendants have failed to pay Allegra monthly royalty fees or contribute to Allegra's marketing fund.  Currently, defendants owe Allegra in excess of $54,888.90 in past due royalties and marketing fund contributions.

24.    On August 13, 2009, Allegra informed defendants in writing that their failure to pay past due amounts under the Franchise Agreement constitutes a default under the Franchise Agreement. Pursuant to the Franchise Agreement, defendants have ten (10) days to cure the default by remitting full payment of the past due amount to Allegra. If defendants fail to pay the past due amount, Allegra intends to exercise its rights under the Franchise Agreement to terminate the Franchise Agreement.

25.    In the event the Franchise Agreement is terminated, Allegra will have the right to enforce the covenant against competition contained in the Franchise Agreement.

## COUNT I – TRADEMARK INFRINGEMENT

26.    Allegra repeats and realleges ¶¶ 1 through 25 of its Complaint as if fully set forth herein.

27.    Defendants' acts, practices, and conduct constitute an infringing use in interstate commerce of a reproduction, counterfeit, copy, or colorable imitation of the Allegra Marks and are likely to cause confusion or mistake or to deceive the public in violation of 15 U.S.C. § 1114(l).

28.    As a direct and proximate result of defendants' infringement, Allegra has been and is likely to be substantially injured in its business, including its goodwill and reputation, resulting in lost revenues and profits, and diminished goodwill.

29.    Allegra has no adequate remedy at law because the Allegra Marks are unique and represents to the public Allegra's identity, reputation, and goodwill, such that damages alone cannot fully compensate Allegra for defendants' misconduct.

30.    Unless enjoined by the Court, defendants will continue to use and to infringe the Allegra Marks to Allegra's irreparable injury. This threat of future injury to Allegra's business

identity, goodwill, and reputation requires injunctive relief to prevent defendants' continued use of the Allegra Marks, and to ameliorate and mitigate Allegra's injuries.

### COUNT II - UNFAIR COMPETITION

31.     Allegra repeats and realleges ¶¶ 1 through 30 for its Complaint as if fully set forth herein.

32.     Defendants' acts, practices, and conduct constitute unfair competition, and false or misleading descriptions or representations of fact, in that they are likely to cause confusion or to cause mistake, to deceive others as to the affiliation, connection, or association of the parties, and/or to misrepresent the nature, characteristics, qualities, or geographic origin of the parties' goods, services and commercial activities, all in violation of 15 U.S.C § 1125(a).

33.     As a direct and proximate result of defendants' unfair competition, Allegra has been and is likely to be substantially injured in its business, including its goodwill and reputation, resulting in lost revenues and profits, and diminished goodwill.

34.     Allegra has no adequate remedy at law because the Allegra Marks are unique and represent to the public Allegra's identity, reputation, and goodwill, such that damages alone cannot fully compensate Allegra for defendants' misconduct.

35.     Unless enjoined by the Court, defendants will continue to compete unfairly with Allegra, to Allegra's irreparable injury.  This threat of future injury to Allegra's business identity, goodwill, and reputation requires injunctive relief to prevent defendants' continued unfair competition, and to ameliorate and mitigate Allegra's injuries.

### COUNT III – BREACH OF THE FRANCHISE AGREEMENT

36.     Allegra repeats and realleges ¶¶ 1 through 35 for its Complaint as if fully set forth herein.

8

37.     Defendants' abandonment of their former franchised Allegra Print & Imaging Center and the establishment of a new center at an unapproved location within a two (2) mile radius of another Allegra franchisee's approved center constitutes a material breach of the Franchise Agreement.

38.     Defendants' breach has caused and, unless enjoined, will continue to cause Allegra to suffer irreparable harm because of the injury to its business, including its goodwill and reputation, as well as its relationship with its existing franchisee operating an Insty Prints center within a two (2) mile radius of defendants' new Virginia location.

39.     Allegra has no adequate legal remedy for defendants' breach because its damages, including harm to its goodwill and relationship with another franchisee, are difficult to quantify, and therefore monetary damages alone cannot adequately, completely and fully compensate Allegra for the harm caused by defendants' misconduct.

40.     Unless enjoined and ordered by the Court to cease operation of their unauthorized Virginia location, defendants' breach will continue to Allegra's irreparable harm.

## COUNT IV – BREACH OF CONTRACT

41.     Allegra repeats and realleges ¶¶ 1 through 40 of its Complaint as if fully set forth herein.

42.     Without approval from Allegra, defendants signed a lease for a location through which to operate an Allegra Printing & Imaging center in Virginia and relocated their center to Virginia in violation of the Franchise Agreement.

43.     Because defendants are operating an Allegra Printing & Imaging center in Virginia without approval from Allegra, defendants are in default under the Franchise

9

Agreement. Should defendants fail to cure that default within the thirty (30) day cure period, Allegra intends to exercise its right to terminate the Franchise Agreement.

44.     Defendants are also in default under the Franchise Agreement for failing to pay royalties and to make marketing contributions due under the Franchise Agreement. If defendants fail to cure such default within the ten (10) day cure period, Allegra intends to exercise its right to terminate the Franchise Agreement.

45.     In the event of termination, defendants will be required to abide by the terms of the covenant not to compete contained in the Franchise Agreement. Under the covenant not to compete, defendants may not operate any competitive business within a ten (10) mile radius of the defendants' former center and/or within a five (5) mile radius of any other center, for a two (2) year period following termination of the Franchise Agreement.

46.     In the event of termination, defendants' operation of a competitive business at their Virginia location will be in violation of the Franchise Agreement's covenant not to compete because that location is within a ten (10) mile radius of defendants former center in Washington D.C. or it is within a five (5) mile radius of any other center.

47.     Unless enjoined and ordered by the Court to cease operation of their unauthorized Virginia location and to perform their post-termination obligations under the Franchise Agreement, defendants' breach will continue to Allegra's irreparable harm.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Allegra respectfully prays for the following relief against defendants:

A.     A preliminary and permanent injunction enjoining defendants, their agents, servants and employees, and those people in active concert or participation with them from:

1.     Using the Allegra Marks, or any trademark, service mark, logo or trade name that is confusingly similar to the Allegra Marks;

2.      Otherwise infringing the Allegra Marks or using any similar designation, alone or in combination with any other components;

3.      Passing off any of products or services as those of Allegra or Allegra's authorized franchisees;

4.      Causing a likelihood of confusion or misunderstanding as to the source or sponsorship of their business, products or services;

5.      Causing a likelihood of confusion or misunderstanding as to their affiliation, connection or association with Allegra and its franchisees or any of Allegra's products or services; and

6.      Unfairly competing with Allegra or its franchisees, in any manner;

7.      Operating an Allegra Print & Imaging Center within a two mile radius of any other Allegra franchisee;

8.      Using any website containing or referencing the Allegra Marks or any variation thereof;

B.      An order pursuant to 15 U.S.C. § 1118 that all labels, signs, prints, packages, wrappers, receptacles, logo items, and advertisements in the possession of defendants, their agents, servants and employees, and those people in active concert or participation with them bearing the Allegra Marks, and all plates, molds, and other means of making the same, if any, be delivered to Allegra at defendants' cost;

C.      An order that defendants be required to promptly eliminate their advertising under the Allegra Marks or any other confusingly similar designations from all media including, but not limited to, newspapers, flyers, coupons, promotions, signs, telephone books, telephone directory assistance listings and mass mailings, and assign to Allegra all telephone numbers used in connection with their former Allegra® Print & Imaging and advertised or listed in association with the Allegra® Print & Imaging, all at defendants' cost;

E.      An order that defendants be required immediately to cease using any of Allegra's confidential or proprietary information, including computer software or similar technology and digital passwords and identifications that Allegra has licensed to defendants, in any business or otherwise and return to Allegra all copies of the Operations Manual and other confidential or proprietary information Allegra has loaned to defendants.

F.      An order that defendants be required to file with the Court and to serve upon Allegra's counsel within ten (10) days after entry of any injunction or order issued herein, a written report, under oath, setting forth in detail the manner in which he has complied with such injunction or order;

11

G.  An order that defendants account and pay over to Allegra all gains, profits and advantages derived by them as a result of their infringement of the Allegra Marks and unfair competition to the full extent provided for by Section 35 of the Lanham Act, 15 U.S.C. § 1117, and by the controlling principles of common law;

H.  An order that defendants pay to Allegra such damages as Allegra has sustained by reason of said trademark infringement and unfair competition; and that, because of the willful nature of said infringement, the Court enter judgment for Allegra for three times the amount of said damages, pursuant to Section 35 of the Lanham Act, 15 U.S.C. § 1117;

I.  Preliminary and permanent injunctive relief ordering defendants to comply strictly with their post-termination restrictive covenant, in the event the Franchise Agreement is terminated;

J.  An award of costs and expenses, including reasonable attorneys' fees, incurred by Allegra in connection with this action as provided for by the Franchise Agreement and statute; and

K.  Such other and further relief as the Court deems just and proper.

Date:  August 14, 2009

Respectfully submitted,

**ALLEGRA NETWORK LLC**
By Counsel

Douglas E. Plocki (Va. Bar No. 48663)
Garbia, MacGregor & Plocki, LLP
4151 Chain Bridge Road
Fairfax, Virginia, 22030
Phone: 703-766-8081
Fax:  703-766-8085
dplocki@garbialaw.com
Counsel for ALLEGRA NETWORK, LLC

Of Counsel:

Fredric A. Cohen (IL Bar No. 6198606)
Amy C. Haywood (IL Bar No. 6288230)
**CHENG COHEN LLC**
1101 W. Fulton Market, Suite 200
Chicago, Illinois 60607

12

P (312) 243-1717
F (312) 277-3961
Fredric.Cohen@chengcohen.com
Amy.Haywood@chengcohen.com

# EXHIBIT A

# ALLEGRA NETWORK LLC

# FRANCHISE AGREEMENT

Michael J. Reeder and Jeffery L. Reeder
**FRANCHISE OWNER**

11/14/2005
**DATE OF AGREEMENT**

1850 M Street N.W.
Washington, D.C. 20036
**CENTER ADDRESS**

ALLEGRA NETWORK 08/2005
–CHGO1:30557946.v2

# TABLE OF CONTENTS

**Page**

1.  PREAMBLES, ACKNOWLEDGMENTS, AND GRANT OF FRANCHISE. .................. 1
    A.   PREAMBLES. .................................................................................................... 1
    B.   ACKNOWLEDGMENTS. .................................................................................. 1
    C.   CORPORATION, LIMITED LIABILITY COMPANY, OR
         PARTNERSHIP. ............................................................................................... 3
    D.   GRANT OF FRANCHISE. ................................................................................ 3
    E.   EXCLUSIVITY. ................................................................................................ 4
    F.   RIGHTS WE RESERVE. ................................................................................... 4
    G.   THE EXERCISE OF OUR JUDGMENT. ......................................................... 5

2.  SITE SELECTION, INDEPENDENT BUSINESS SELECTION, LEASE OF
    PREMISES, AND DEVELOPMENT AND OPENING OF YOUR CENTER. .................. 5
    A.   SITE SELECTION. ............................................................................................ 5
    B.   INDEPENDENT BUSINESS SELECTION. ..................................................... 6
    C.   LEASE OF PREMISES. ..................................................................................... 6
    D.   CENTER DEVELOPMENT. .............................................................................. 7
    E.   OPERATING ASSETS. ..................................................................................... 7
    F.   COMPUTER SYSTEM. ..................................................................................... 7
    G.   CENTER OPENING. ......................................................................................... 8

3.  FEES. ............................................................................................................................ 8
    A.   INITIAL FEES. ................................................................................................. 8
    B.   ROYALTY FEE. ................................................................................................ 9
    C.   INTEREST ON LATE PAYMENTS. ................................................................ 9
    D.   APPLICATION OF PAYMENTS. .................................................................... 9
    E.   METHOD OF PAYMENT. ................................................................................ 9

4.  TRAINING AND ASSISTANCE. .............................................................................. 10
    A.   TRAINING. ..................................................................................................... 10
    B.   GENERAL GUIDANCE. ................................................................................ 11
    C.   OPERATIONS MANUALS. ........................................................................... 11
    D.   DELEGATION OF PERFORMANCE. ........................................................... 12

5.  MARKS. ..................................................................................................................... 12
    A.   OWNERSHIP AND GOODWILL OF MARKS. ............................................ 12
    B.   LIMITATIONS ON YOUR USE OF MARKS. ............................................... 12
    C.   NOTIFICATION OF INFRINGEMENTS AND CLAIMS. ............................. 13
    D.   DISCONTINUANCE OF USE OF MARKS. .................................................. 13
    E.   INDEMNIFICATION FOR USE OF MARKS. ............................................... 13

6.  CONFIDENTIAL INFORMATION. .......................................................................... 13

7.  EXCLUSIVE RELATIONSHIP. ................................................................................ 15

8.    CENTER OPERATIONS AND SYSTEM STANDARDS. .................................... 16
      A.    CONDITION AND APPEARANCE OF YOUR CENTER. ..................... 16
      B.    PRODUCTS AND SERVICES THE BUSINESS OFFERS ...................... 16
      C.    MANAGEMENT OF THE BUSINESS ................................................ 16
      D.    APPROVED PRODUCTS, SERVICES, AND SUPPLIERS. ................... 16
      E.    COMPLIANCE WITH LAWS AND GOOD BUSINESS PRACTICES. ........... 17
      F.    INSURANCE. ............................................................................... 18
      G.    COMPLIANCE WITH SYSTEM STANDARDS. .................................. 18

9.    MARKETING. .................................................................................. 19
      A.    MARKETING FUND. ..................................................................... 19
      B.    BY YOU. ...................................................................................... 21
      C.    LOCAL ADVERTISING COOPERATIVE. ......................................... 21
      D.    FRANCHISE SYSTEM WEBSITE. .................................................... 22
      E.    MARKETSMART PROGRAM. ......................................................... 23

10.   RECORDS, REPORTS, AND FINANCIAL STATEMENTS. ............................... 23

11.   INSPECTIONS AND AUDITS. ............................................................... 24
      A.    OUR RIGHT TO INSPECT YOUR CENTER. ..................................... 24
      B.    OUR RIGHT TO AUDIT. ................................................................ 25

12.   TRANSFER. ...................................................................................... 25
      A.    BY US. ......................................................................................... 25
      B.    BY YOU. ...................................................................................... 25
      C.    CONDITIONS FOR APPROVAL OF TRANSFER. ............................... 26
      D.    TRANSFER TO A WHOLLY-OWNED CORPORATION OR LIMITED
            LIABILITY COMPANY. ................................................................. 28
      E.    YOUR DEATH OR DISABILITY. .................................................... 28
      F.    EFFECT OF CONSENT TO TRANSFER. ........................................... 29
      G.    OUR RIGHT OF FIRST REFUSAL. .................................................. 29

13.   EXPIRATION OF THIS AGREEMENT. ..................................................... 31
      A.    YOUR RIGHT TO ACQUIRE A SUCCESSOR FRANCHISE. ................ 31
      B.    GRANT OF A SUCCESSOR FRANCHISE. ........................................ 31
      C.    AGREEMENTS/RELEASES. ........................................................... 33

14.   TERMINATION OF AGREEMENT. ......................................................... 33
      A.    BY YOU. ...................................................................................... 33
      B.    BY US. ......................................................................................... 34
      C.    ASSUMPTION OF MANAGEMENT. ................................................ 36

15.   OUR AND YOUR RIGHTS AND OBLIGATIONS UPON TERMINATION OR
      EXPIRATION OF THIS AGREEMENT. ..................................................... 36
      A.    PAYMENT OF AMOUNTS OWED TO US. ....................................... 36
      B.    DE-IDENTIFICATION. .................................................................. 36
      C.    CONFIDENTIAL INFORMATION. ................................................... 37

|  | D. | COVENANT NOT TO COMPETE. | 37 |
|  | E. | OUR RIGHT TO PURCHASE YOUR CENTER. | 38 |
|  | F. | CONTINUING OBLIGATIONS. | 39 |
| 16. | | RELATIONSHIP OF THE PARTIES/INDEMNIFICATION. | 39 |
|  | A. | INDEPENDENT CONTRACTORS. | 39 |
|  | B. | NO LIABILITY FOR ACTS OF OTHER PARTY. | 40 |
|  | C. | TAXES. | 40 |
|  | D. | INDEMNIFICATION. | 40 |
| 17. | | ENFORCEMENT. | 41 |
|  | A. | SECURITY INTEREST. | 41 |
|  | B. | SEVERABILITY AND SUBSTITUTION OF VALID PROVISIONS. | 41 |
|  | C. | WAIVER OF OBLIGATIONS. | 41 |
|  | D. | COSTS AND ATTORNEYS' FEES. | 42 |
|  | E. | YOU MAY NOT WITHHOLD PAYMENTS DUE TO US. | 42 |
|  | F. | RIGHTS OF PARTIES ARE CUMULATIVE. | 42 |
|  | G. | ARBITRATION. | 43 |
|  | H. | GOVERNING LAW. | 44 |
|  | I. | CONSENT TO JURISDICTION. | 44 |
|  | J. | WAIVER OF PUNITIVE DAMAGES AND JURY TRIAL. | 44 |
|  | K. | INJUNCTIVE RELIEF. | 45 |
|  | L. | BINDING EFFECT. | 45 |
|  | M. | LIMITATIONS OF CLAIMS. | 45 |
|  | N. | CONSTRUCTION. | 45 |
| 18. | | NOTICES AND PAYMENTS. | 46 |
| 19. | | ELECTRONIC MAIL. | 47 |

EXHIBIT A   PREMISES

EXHIBIT B   EXCLUSIVE TERRITORY

EXHIBIT C   LISTING OF OWNERSHIP INTERESTS

EXHIBIT D   ALLEGRA AND AMERICAN SPEEDY RIDER

EXHIBIT E   INSTY-PRINTS RIDER

ALLEGRA NETWORK 08/2005
–CHGO1:30557946.v2

### ALLEGRA NETWORK LLC
### FRANCHISE AGREEMENT

**THIS FRANCHISE AGREEMENT** (the "Agreement") is made and entered into as of the _14th_ day of _November_____, 200_ (the "Effective Date") (regardless of the dates of the parties' signatures) by and between **ALLEGRA NETWORK LLC**, a Michigan limited liability company with its principal business address at 21680 Haggerty Road, Suite 105S, Northville, Michigan 48167 ("we," "us," or "our"), and Michael J. Reeder and Jeffery L. Reeder, whose principal business address is 1850 M Street N.W., Washington, D.C. 20036 ("you" or "your").

1.     **PREAMBLES, ACKNOWLEDGMENTS, AND GRANT OF FRANCHISE.**

A.     **PREAMBLES.**

(1)     We and our affiliates have, over a considerable time period and with considerable effort, developed printing and copy centers specializing in digital and offset printing, copying, graphic design, electronic pre-press, binding, mailing services, promotional products and related products and services known as *Allegra®* Print & Imaging Centers, *American Speedy®* Printing Centers or *Insty-Prints®* Centers (individually, "Center" and collectively, "Centers"). These Centers have distinctive business formats, methods, procedures, designs, layouts, standards, and specifications, all of which we may improve, further develop, or otherwise modify from time to time.

(2)     We and our affiliates use, promote, and license certain trademarks, service marks, and other commercial symbols in operating the Centers, including, without limitation, the *Allegra®*, *American Speedy®* and *Insty-Prints®* marks, which have gained and will continue to gain public acceptance and goodwill, and may create, use, and license other trademarks, service marks, and commercial symbols for the Centers (collectively, the "Marks").

(3)     We grant to persons who meet our qualifications, and are willing to undertake the investment and effort, a franchise to own and operate a Center offering the products and services we authorize and using our and our affiliates' business formats, methods, procedures, signs, designs, layouts, standards, specifications, and Marks (the "Franchise System").

(4)     You have applied for a franchise to own and operate a Center.

B.     **ACKNOWLEDGMENTS.**

You acknowledge:

(1)     That you have independently investigated this franchise opportunity and recognize that, like any other business, the nature of the business a Center conducts may, and probably will, evolve and change over time.

(2)     That an investment in a Center involves business risks that could result in the loss of a significant portion or all of your investment.

(3)     That your business abilities and efforts are vital to your success and the success of your Center.

(4)     That attracting customers for your Center (as defined in Subsection D below) will require you to make consistent marketing efforts in your community through various methods, including media advertising, direct mail advertising and networking, and display and use of in-store promotional materials.

(5)     That retaining customers for your Center will require you to have a high level of customer service and to adhere strictly to the Franchise System and our System Standards (as defined in Section 4.C) and that you are committed to maintaining System Standards.

(6)     That you have not received from us, and are not relying upon, any representations or guarantees, express or implied, as to the potential volume, sales, income, or profits of a Center, that any information you have acquired from other Center franchise owners regarding their sales, profits, or cash flows was not information obtained from us, and that we make no representation about that information's accuracy.

(7)     That in all of their dealings with you, our officers, directors, employees, and agents act only in a representative, and not in an individual, capacity and that business dealings between you and them as a result of this Agreement are deemed to be only between you and us.

(8)     That you have represented to us, to induce our entry into this Agreement, that all statements you have made and all materials you have given us are accurate and complete and that you have made no misrepresentations or material omissions in obtaining the franchise.

(9)     That you have read this Agreement and our Franchise Offering Circular and understand and accept that this Agreement's terms and covenants are reasonably necessary for us to maintain our high standards of quality and service, as well as the uniformity of those standards at each Center, and to protect and preserve the goodwill of the Marks.

(10)     That we have not made any representation, warranty, or other claim regarding this franchise opportunity, other than those made in this Agreement and our Franchise Offering Circular, and that you have independently evaluated this opportunity, including by using your business professionals and advisors, and have relied solely upon those evaluations in deciding to enter into this Agreement.

(11)     That you have been afforded an opportunity to ask any questions you have and to review any materials of interest to you concerning this franchise opportunity.

2

(12)    That you have been afforded an opportunity, and have been encouraged by us, to have this Agreement and all other agreements and materials we have given or made available to you reviewed by an attorney and have either done so or elected not to do so.

(13)    That you have a net worth which is sufficient to make the investment in the franchise opportunity represented by this Agreement, and you will have sufficient funds to meet all of your obligations under this Agreement.

## C.   CORPORATION, LIMITED LIABILITY COMPANY, OR PARTNERSHIP.

If you are at any time a corporation, limited liability company, or partnership (each, an "Entity"), you agree and represent that:

(1)    You will have the authority to execute, deliver, and perform your obligations under this Agreement and all related agreements and are duly organized or formed and validly existing in good standing under the laws of the state of your incorporation or formation;

(2)    Your organizational documents, operating agreement, or partnership agreement, as applicable, will recite that this Agreement restricts the issuance and transfer of any ownership interests in you, and all certificates and other documents representing ownership interests in you will bear a legend referring to this Agreement's restrictions;

(3)    Exhibit C to this Agreement completely and accurately describes all of your owners and their interests in you as of the Effective Date;

(4)    Each of your owners during this Agreement's term will execute a guaranty in the form we prescribe undertaking personally to be bound, jointly and severally, by all provisions of this Agreement and any ancillary agreements between you and us. Subject to our rights and your obligations under Section 12, you and your owners agree to sign and deliver to us revised Exhibits C to reflect any permitted changes in the information that Exhibit C now contains;

(5)    Your Center and other Centers, if applicable, will be the only businesses you operate (although your owners may have other, non-competitive business interests); and

(6)    You must identify on Exhibit C one of your owners who is a natural person with at least twenty percent (20%) ownership interest and voting power in you and who will have the authority of a chief executive officer (the "Managing Owner"). You agree to deliver to us a revised Exhibit C to accurately identify the Managing Owner.

## D.   GRANT OF FRANCHISE.

You have applied for a franchise to own and operate a Center at the site identified on Exhibit A attached hereto (the "Premises"). Subject to this Agreement's terms, we grant you a

franchise (the "Franchise") to operate a Center under the name [X] *Allegra®* Print & Imaging, [ ] *American Speedy®* Printing Center or [ ] *Insty-Prints®* at the Premises ("your Center"), and to use the Franchise System in its operation, for a term beginning on the Effective Date and expiring twenty (20) years from that date, unless sooner terminated under Section 14. If you will operate your Center under the name Allegra® Print & Imaging Center or American Speedy® Printing Center, you will execute the form of Allegra and American Speedy Rider attached hereto as Exhibit D (the "Allegra and American Speedy Rider") simultaneously herewith which will be annexed to and be part of this Agreement. If you are operating your Center under the name Insty-Prints® Center, you will execute the form of Insty-Prints Rider attached hereto as Exhibit E (the "Insty-Prints Rider") simultaneously herewith which will be annexed to and be part of this Agreement.

You agree at all times faithfully, honestly, and diligently to perform your obligations under this Agreement and to use your best efforts to promote your Center. You may use the Premises only for your Center. You agree not to conduct the business of your Center at any location other than the Premises. In addition, except in connection with the approved Franchise System Website (as defined in Section 9.E) below, you may not engage in any promotional or similar activities, whether directly or indirectly, through or on the Internet, the World Wide Web, or any other similar proprietary or common carrier electronic delivery system.

E.   **EXCLUSIVITY**.

We and our affiliates will not operate or grant a franchise for the operation of another Center, the physical premises of which are located within the geographical area described in Exhibit B (the "Exclusive Area"). You acknowledge and agree that other Centers may market and solicit customers in your Exclusive Area and, likewise, you may market and solicit customers in the exclusive area of the other Centers.

F.   **RIGHTS WE RESERVE**.

Except as expressly limited by Subsection E above, you acknowledge that we (and our affiliates) retain the right at all times during this Agreement's term to engage in any and all activities that we (and they) deem appropriate, wherever and whenever we (and they) desire, and whether or not such activities compete with your Center, including, without limitation, the right to:

(1)   establish and operate, and allow others to establish and operate, other Centers and other printing and copying businesses using the Marks and the Franchise System, at any location outside the Exclusive Territory and on such terms and conditions we deem appropriate;

(2)   establish and operate, and allow others to establish and operate, printing and copying businesses, located anywhere (including in the Exclusive Territory), that may offer products and services which are identical or similar to products and services offered by the Centers, under other trade names, trademarks, service marks and commercial symbols different from the Marks, and on any terms and conditions we deem appropriate;

4

(3)     establish, and allow others to establish, other businesses and distribution channels (including, but not limited to, the Internet), wherever located or operating and regardless of the nature or location of the customers with whom such other businesses and distribution channels do business, that operate under the Marks or any other trade names, trademarks, service marks or commercial symbols that are the same as or different from the Centers, and that sell products and/or services that are identical or similar to, and/or competitive with, those that the Centers customarily sell under any terms and conditions we deem appropriate;

(4)     acquire the assets or ownership interests of one or more businesses providing products and services similar to those provided at Centers, and franchising, licensing or creating similar arrangements with respect to these businesses once acquired, wherever these businesses (or the franchisees or licensees of these businesses) are located or operating (including in the Exclusive Territory);

(5)     be acquired (whether through acquisition of assets, ownership interests or otherwise, regardless of the form of transaction), by a business providing products and services similar to those provided at Centers, or by another business, even if such business operates, franchises and/or licenses competitive businesses in the Exclusive Territory; and

(6)     engage in all other activities not expressly prohibited by this Agreement.

## G.     THE EXERCISE OF OUR JUDGMENT.

We have the right to operate, develop, and change the Franchise System in any manner that is not specifically prohibited by this Agreement. Whenever we have reserved in this Agreement a right to take or to withhold an action, to grant or decline to grant you a right to take or withhold an action, or to provide or withhold approval or consent, we may, except as otherwise specifically provided in this Agreement, make our decision or exercise our rights based on information readily available to us and on our judgment of what is in our and/or the Franchise System's best interests at the time our decision is made.

## 2.     SITE SELECTION, INDEPENDENT BUSINESS SELECTION, LEASE OF PREMISES, AND DEVELOPMENT AND OPENING OF YOUR CENTER.

### A.     SITE SELECTION.

We must approve the Premises and you may operate your Center only at the Premises. You acknowledge and agree that, if we recommend or give you information regarding a site for the Premises, that is not a representation or warranty of any kind, express or implied, of the site's suitability for a Center or any other purpose. Our recommendation indicates only that we believe that the site meets our then acceptable criteria. Applying criteria that have appeared effective with other sites and premises might not accurately reflect the potential for all sites and premises, and demographic and/or other factors included in or excluded from our criteria could change, altering the potential of a site and premises. The uncertainty and instability of these criteria are beyond our control, and we are not responsible if a site and premises we recommend fail to meet your expectations. You acknowledge and agree that your acceptance of the Franchise and

selection of the Premises are based on your own independent investigation of the site's suitability for the Premises.

### B.   INDEPENDENT BUSINESS SELECTION.

If you are acquiring an independent printing business for conversion of such business into a Center you will operate under this Agreement ("Independent Business"), we must approve the Independent Business. You acknowledge and agree that our recommendation or approval of the Independent Business indicates only that we believe that the Independent Business meets our then acceptable criteria. You further acknowledge and agree that your acceptance of the Franchise and selection of the Independent Business are based on your own independent investigation of the Independent Business' suitability for conversion into a Center.

### C.   LEASE OF PREMISES.

We have the right to approve the terms of any lease or sublease for the Premises (the "Lease") before you sign it, and you may not sign the Lease without our prior written approval. The Lease must contain certain required terms and provisions (although we will not directly negotiate your Lease), including, but not limited to:

(1)   A provision reserving to us the right to receive an assignment of the Lease upon termination or expiration of the Franchise;

(2)   A provision requiring the lessor to give us all information we request relating to your Center's operation;

(3)   A provision requiring the lessor concurrently to send us a copy of any written notice of a Lease default sent to you and granting us the right (but without any obligation) to cure any Lease default within fifteen (15) business days after the expiration of your cure period (if you fail to do so);

(4)   A provision evidencing your right to display the Marks according to the specifications in the (as defined in Section 4.B) (subject only to applicable law);

(5)   A provision that the Premises may be used only for the operation of your Center; and

(6)   A provision that it may not be materially modified without our prior written consent and that we receive copies of such modifications when proposed and when signed.

If the Lease expires or is terminated without your fault, or if the site for the Premises is destroyed, condemned, or otherwise rendered unusable, we will allow you to relocate your Center to a new site acceptable to us. Any relocation will be at your sole expense.

ALLEGRA NETWORK 08/2005
~CHGO1:30557946.v2

D.     **CENTER DEVELOPMENT.**

Within ninety (90) days after the date you sign a lease for the Premises, you agree at your expense to do the following: (a) obtain and submit to us for approval detailed construction plans and specifications and space plans for your Center that comply with any design specifications provided by us and all applicable ordinances, building codes, permit requirements, and lease requirements and restrictions; (b) obtain all required zoning changes, planning consents, building, utility, sign and business permits, licenses and approvals and any other consents, permits and licenses necessary to lawfully open and operate your Center; (c) construct all required improvements in compliance with construction plans and specifications approved by us; (d) decorate your Center in compliance with plans and specifications approved by us; (e) purchase and install all required equipment (including the Computer System (as defined in Section 2.F below), furniture, fixtures and signs (collectively the "Operating Assets"); and (f) obtain all customary contractors' sworn statements and partial and final waivers of lien for construction, remodeling, decorating and installation services.

E.     **OPERATING ASSETS.**

You agree to use in operating your Center only those Operating Assets that we approve for Centers as meeting our specifications and standards for quality, design, appearance, function, and performance.  You agree to place or display at the Premises (interior and exterior) only the signs, emblems, lettering, logos, and display materials that we approve from time to time.  You agree to purchase or lease approved brands, types, or models of Operating Assets only from suppliers we designate or approve (which may include or be limited to us and/or our affiliates).

F.     **COMPUTER SYSTEM.**

You agree to obtain and use specified integrated computer hardware and/or software, including an integrated computer-based order-entry system (the "Computer System").  We may modify specifications for, and components of, the Computer System.  You also agree to maintain a functioning e-mail address and all specified points of high-speed Internet connection.  Our modification of specifications for the Computer System, and/or other technological developments or events, might require you to purchase, lease, and/or license new or modified computer hardware and/or software and to obtain service and support for the Computer System. Although we cannot estimate the future costs of the Computer System or required service or support, and although these costs might not be fully amortizable over this Agreement's remaining term, you agree to incur the costs of obtaining the computer hardware and software comprising the Computer System (or additions and modifications) and required service or support.  We have no obligation to reimburse you for any Computer System costs.  Within sixty (60) days after you receive notice from us, you agree to obtain the Computer System components that we designate and to ensure that your Computer System, as modified, is functioning properly.

You agree that we or our affiliates may condition any license of proprietary software to you, or your use of technology that we or our affiliates develop or maintain, on your signing the Software License Agreement or similar document that we or our affiliates prescribe to regulate your use of, and our and your respective rights and responsibilities with respect to, the software or technology.  We and our affiliates may charge you a monthly or other fee for any proprietary

7

software or technology that we or our affiliates license to you and for other maintenance and support services that we or our affiliates provide during this Agreement's term.

Although you agree to buy, use, and maintain the Computer System according to our standards and specifications, you will have sole and complete responsibility for: (1) the acquisition, operation, maintenance, and upgrading of the Computer System; (2) the manner in which your Computer System interfaces at our specified levels of connection speed with our and any third party's computer system; and (3) any and all consequences if the Computer System is not properly operated, maintained, and upgraded.

G.   **CENTER OPENING.**

You agree not to open your Center until:

(1)    we notify you in writing that your Center meets our standards and specifications;

(2)    you (or your Managing Owner) satisfactorily complete training;

(3)    you pay the initial franchise fee and other amounts then due to us; and

(4)    you give us certificates for all required insurance policies.

Subject to your compliance with these conditions, you agree to open your Center for business:

(a)    within ninety (90) days after the Effective Date or the date you sign the Lease, whichever is later, but in no event later than one hundred twenty (120) days after the Effective Date, if you are a starting your own business at the Premises for the operation of your Center; or

(b)    within one (1) year after the Effective Date if you are acquiring an Independent Business and converting such business to meet our standards and specifications for an *Allegra*® Print & Imaging Center. Upon your acquisition of the Independent Business (which must be completed within one (1) year after the Effective Date), you must immediately commence to pay Royalty (as defined below), Marketing Fund (as defined below) contributions, and all other amounts due to us under this Agreement (even if you have not completed the conversion process). However, you will have three (3) months from the date of the acquisition to complete the conversion of the Independent Business. At the end of such three (3) month period, your Center must be operating under the Marks pursuant to the Franchise System.

3.   **FEES.**

A.   **INITIAL FEES.**

You agree to pay us a nonrecurring and, except as specifically provided in this Agreement, nonrefundable initial franchise fee of Thirty Thousand Dollars ($30,000). If you are

purchasing an existing Center, you do not pay us an initial franchise fee. However, you will pay us a training fee in the amount of Nine Thousand Five Hundred Dollars ($9,500). The initial franchise fee (or training fee) is due, and fully earned by us, when you sign this Agreement. If you paid a deposit at the time you submitted your application for a franchise, the amount of such deposit will be applied towards the initial franchise fee (or training fee).

### B.   **ROYALTY FEE.**

You agree to pay us royalties in accordance with the terms of the Allegra and American Speedy Rider or the Insty-Prints Rider, whichever is applicable (the "Royalty").

### C.   **INTEREST ON LATE PAYMENTS.**

All amounts which you owe us for any reason will bear interest accruing as of their due date at one and one-half percent (1.5%) per month or the highest commercial contract interest rate the law allows, whichever is less. We may debit your bank account automatically for the service charge and interest. You acknowledge that this Subsection is not our agreement to accept any payments after they are due or our commitment to extend credit to, or otherwise finance your operation of, your Center.

### D.   **APPLICATION OF PAYMENTS.**

Despite any designation you make, we may apply any of your payments to any of your past due indebtedness to us. We may set off any amounts you or your owners owe us or our affiliates against any amounts we or our affiliates owe you or your owners.

### E.   **METHOD OF PAYMENT.**

Concurrently with the execution hereof, you agree to sign and deliver to us the documents we require to authorize us to debit your business checking account automatically for the Royalty, Marketing Fund (as defined in Section 9.A) contributions, and other amounts due under this Agreement (the "EFT Authorization"). Such EFT Authorization shall remain in full force and effect during the term of this Agreement. We will debit the business account you designate in the EFT Authorization for these amounts on their due dates (or the subsequent business day if the due date is a national holiday or a weekend day). You agree to ensure that funds are available in your designated account to cover our withdrawals.

If you fail to report the Total Monthly Receipts (as defined in the Allegra and American Speedy Rider) or Gross Sales (as defined in the Insty-Prints Rider), whichever is applicable, we may debit your account for one hundred ten percent (110%) of the average of the last three (3) Royalty and Marketing Fund contributions that we debited. If the amounts that we debit from your account are less than the amounts you actually owe us (once we have determined your Center's true and correct Total Monthly Receipts or Gross Sales, whichever is applicable), we will debit your account for the balance on the day we specify. If the amounts that we debit from your account are greater than the amounts you actually owe us, we will credit the excess against the amounts we otherwise would debit from your account during the following month.

9

We may require you to pay any amounts due under this Agreement or otherwise by means other than automatic debit (*e.g.*, by check) whenever we deem appropriate, and you agree to comply with our payment instructions.

4.    **TRAINING AND ASSISTANCE.**

A.    **TRAINING.**

Before your Center opens for business, we will train you (or your Managing Owner if you are an Entity) and one (1) employee on the material aspects of operating a Center. We will provide approximately ten (10) days of training (although the specific number of days depends on our opinion of your or your Managing Owner's, and your employee's, experience and needs) at our principal offices or at a designated training facility of our choice. You (or your Managing Owner) must satisfactorily complete initial training prior to operating your Center. If we determine that you (or your Managing Owner) cannot complete initial training to our satisfaction, we may terminate this Agreement.

We provide initial training for no additional fee for two (2) persons. You will be responsible for your employee's travel and living expenses, wages and workers' compensation insurance while attending training.

You (or your Managing Owner) may request additional training at the end of the initial training program, to be provided at our then current per diem charges, if you (or your Managing Owner) do not feel sufficiently trained in the operation of a Center. We and you will jointly determine the duration of this additional training. However, if you (or your Managing Owner) satisfactorily complete our initial training program, and have not expressly informed us in writing at the end of that program that you (or your Managing Owner) do not feel sufficiently trained in the operation of a Center, then you will be deemed to have been trained sufficiently to operate a Center.

Within the first ninety (90) days after your Center opens for business, we will, at our own cost, send one of our representatives to your Center to assist with you with the Center's operations from time to time for an aggregate of at least five (5) days. You also must successfully complete this phase of the initial training program. If you request, and we agree to provide, additional or special guidance, assistance, or training during this opening phase, we may charge you then applicable fee, including our personnel's per diem charges and travel and living expenses.

We may require you (or your Managing Owner) and/or previously trained and experienced employees to attend and complete satisfactorily various training courses that we periodically choose to provide at the times and locations that we designate. We will not require attendance at more than two (2) such courses, or for more than a total of three (3) business days, during a calendar year. Besides attending these courses, you agree to attend an annual meeting of all Center franchise owners at a location we designate. Attendance will not be required for more than five (5) days during any calendar year. You agree to pay all costs to attend.

10

If you have a new Managing Owner during this Agreement's term, the new Managing Owner must satisfactorily complete our then current initial training program. We may charge reasonable fees for training new Managing Owners. You also agree to pay all travel and living expenses which your Managing Owner incurs during all training courses and programs.

You understand and agree that any specific ongoing training or advice we provide does not create an obligation (whether by course of dealing or otherwise) to continue to provide such specific training or advice, all of which we may discontinue and modify from time to time.

## B.   GENERAL GUIDANCE.

We will advise you from time to time regarding your Center's operation based on your reports or our inspections and will guide you with respect to:

(1)     standards, specifications, and operating procedures and methods that Centers use;

(2)     purchasing required and authorized Operating Assets and other products and services;

(3)     advertising and marketing materials and programs;

(4)     employee hiring and training; and

(5)     administrative, bookkeeping, accounting, and financial management.

We will furnish to you guidance in connection with the operation of your Center. Such guidance will be furnished in the form of our operations manuals for the operation of Centers (the "Operations Manuals"), which may include one or more separate manuals as well as audiotapes, videotapes, compact discs, computer software, information available on an Internet site, other electronic media, and/or written materials. We may also provide guidance via telephonic conversations and/or consultation at our offices. If you request, and we agree to provide, additional or special guidance, assistance, or training, we may charge you our then applicable fee, including our personnel's per diem charges and travel and living expenses.

## C.   OPERATIONS MANUALS.

We will loan you during the term of this Agreement one (1) copy the Operations Manuals. The Operations Manuals contain mandatory and suggested specifications, standards, operating procedures, and rules that we periodically prescribe for operating Centers ("System Standards") and information on your other obligations under this Agreement. We may modify the Operations Manuals periodically to reflect changes in System Standards. You agree to keep your copy of the Operations Manuals current and in a secure location at your Center. If there is a dispute over its contents, our master copy of the Operations Manuals controls. You agree that the Operations Manuals' contents are confidential and that you will not disclose the Operations Manuals to any person other than your employees who need to know its contents. You may not

11

at any time copy, duplicate, record, or otherwise reproduce any part of the Operations Manuals. If your copy of the Operations Manuals is lost, destroyed, or significantly damaged, you agree to obtain a replacement copy at our then applicable charge.

At our option, we may post some or all of the Operations Manuals on a restricted Website or extranet to which you will have access. (For purposes of this Agreement, "Website" means an interactive electronic document contained in a network of computers linked by communications software, including, without limitation, the Internet and World Wide Web home pages). If we do so, you agree to monitor and access the Website or extranet for any updates to the Operations Manuals or System Standards. Any passwords or other digital identifications necessary to access the Operations Manuals on a Website or extranet will be deemed to be part of Confidential Information (as defined in Section 6).

### D.   DELEGATION OF PERFORMANCE.

You agree that we have the right to delegate the performance of any portion or all of our obligations under this Agreement to third-party designees, whether these designees are our agents or independent contractors with whom we have contracted to perform these obligations.

## 5.   MARKS.

### A.   OWNERSHIP AND GOODWILL OF MARKS.

Our parent, Allegra Holdings LLC ("Holdings"), has licensed the Marks to us to use, and to sublicense, in connection with the development and operation of Centers in the United States. Your right to use the Marks is derived only from this Agreement and limited to your operating your Center according to this Agreement and all System Standards we prescribe during its term. Your unauthorized use of the Marks is a breach of this Agreement and infringes our and Holdings' rights in the Marks. You acknowledge and agree that your use of the Marks and any goodwill established by that use are exclusively for our and Holdings' benefit and that this Agreement does not confer any goodwill or other interests in the Marks upon you (other than the right to operate your Center under this Agreement). All provisions of this Agreement relating to the Marks apply to any additional proprietary trade and service marks we authorize you to use. You may not at any time during or after this Agreement's term contest or assist any other person in contesting the validity of, or our and Holdings' rights to, the Marks.

### B.   LIMITATIONS ON YOUR USE OF MARKS.

You agree to use the Marks as your Center's sole identification, except that you agree to identify yourself as its independent owner in the manner we prescribe. You may not use any Mark (1) as part of any corporate or legal business name, (2) with any prefix, suffix, or other modifying words, terms, designs, or symbols (other than logos we have licensed to you), (3) in selling any unauthorized services or products, (4) as part of any domain name, homepage, electronic address, or otherwise in connection with a Website (unless in connection with our approved Franchise System Website), or (5) in any other manner that we have not expressly authorized in writing. You may not use any Mark in advertising the transfer, sale, or other disposition of your Center or an ownership interest in you without our prior written consent. You agree to display the Marks prominently as we prescribe at your Center and on forms,

ALLEGRA NETWORK 08/2005
~CHGO1:30557946.v2

advertising, supplies, and other materials we designate. You agree to give the notices of trade and service mark registrations that we specify and to obtain any fictitious or assumed name registrations required under applicable law.

### C.   NOTIFICATION OF INFRINGEMENTS AND CLAIMS.

You agree to notify us immediately of any apparent infringement or challenge to your use of any Mark, or of any person's claim of any rights in any Mark, and not to communicate with any person other than us, Holdings, and our attorneys, and your attorneys, regarding any infringement, challenge, or claim. We and Holdings may take the action we deem appropriate (including no action) and control exclusively any litigation, U.S. Patent and Trademark Office proceeding, or other administrative proceeding arising from any infringement, challenge, or claim or otherwise concerning any Mark. You agree to sign any documents and take any other reasonable action that, in the opinion of our and Holdings' attorneys, are necessary or advisable to protect and maintain our and Holdings' interests in any litigation or Patent and Trademark Office or other proceeding or otherwise to protect and maintain our and Holdings' interests in the Marks. We or Holdings will reimburse you for your costs of taking any action that we or Holdings has asked you to take.

### D.   DISCONTINUANCE OF USE OF MARKS.

If it becomes advisable at any time for us, Holdings, and/or you to modify or discontinue using any Mark and/or to use one or more additional or substitute trade or service marks, you agree to comply with our directions within a reasonable time after receiving notice. We need not reimburse you for your direct expenses of changing your Center's signs, for any loss of revenue due to any modified or discontinued Mark, or for your expenses of promoting a modified or substitute trademark or service mark.

Our rights in this Subsection D apply to any and all of the Marks (and any portion of any Mark) that we authorize you to use in this Agreement. We may exercise these rights at any time and for any reason, business or otherwise, that we think best. You acknowledge both our right to take this action and your obligation to comply with our directions.

### E.   INDEMNIFICATION FOR USE OF MARKS.

We agree to reimburse you for all damages and expenses that you incur in any trademark infringement proceeding disputing your authorized use of any Mark under this Agreement if you have timely notified us of, and comply with our directions in responding to, the proceeding. At our option, we and/or Holdings may defend and control the defense of any proceeding arising from your use of any Mark under this Agreement.

## 6.   CONFIDENTIAL INFORMATION.

We and our affiliates possess (and will continue to develop and acquire) certain confidential information, some of which constitutes trade secrets under applicable law (the "Confidential Information"), relating to developing and operating Centers, including (without limitation):

13

(1)     site selection criteria;

(2)     training and operations materials and manuals, including, without limitation, the Operations Manuals;

(3)     the System Standards and other methods, formats, specifications, standards, systems, procedures, techniques, sales and marketing techniques, knowledge, and experience used in developing and operating Centers;

(4)     market research, promotional, marketing and advertising programs for Centers;

(5)     knowledge of specifications for, and suppliers of, Operating Assets and other products and supplies;

(6)     any computer software or similar technology which is proprietary to us, our affiliates, or the Franchise System, including, without limitation, digital passwords and identifications and any source code of, and data, reports, and other printed materials generated by, the software or similar technology;

(7)     knowledge of the operating results and financial performance of Centers other than your Center; and

(8)     your Center's customer list.

You acknowledge and agree that you will not acquire any interest in Confidential Information, other than the right to use it as we specify in operating your Center during this Agreement's term, and that Confidential Information is proprietary, includes our and our affiliates' trade secrets, and is disclosed to you only on the condition that you agree, and you in fact do agree, that you:

(a)     will not use Confidential Information in any other business or capacity;

(b)     will keep each item deemed to be part of Confidential Information absolutely confidential, both during this Agreement's term and then thereafter for as long as the item is not generally known to the public;

(c)     will not make unauthorized copies of any Confidential Information disclosed via electronic medium or in written or other tangible form; and

(d)     will adopt and implement reasonable procedures to prevent unauthorized use or disclosure of Confidential Information, including, without limitation, restricting its disclosure to your personnel and others and using non-disclosure and non-competition agreements with those having access to Confidential Information. We have the right to regulate the form of agreements that you use and to be a third party beneficiary of those agreements with independent enforcement rights.

14

Confidential Information does not include information, knowledge, or know-how which you can demonstrate lawfully came to your attention before we provided it to you directly or indirectly; which, at the time we disclosed it to you, already had lawfully become generally known through publication or communication by others (without violating an obligation to us or our affiliates); or which, after we disclose it to you, lawfully becomes generally known through publication or communication by others (without violating an obligation to us or our affiliates). However, if we include any matter in Confidential Information, anyone who claims that it is not Confidential Information must prove that one of the exclusions provided in this paragraph is fulfilled.

All ideas, concepts, techniques, or materials relating to a Center, whether or not protectable intellectual property and whether created by or for you or your owners or employees, must be promptly disclosed to us and will be deemed to be our and our affiliates' sole and exclusive property, part of the Franchise System, and works made-for-hire for us and our affiliates. To the extent that any item does not qualify as a "work made-for-hire" for us and our affiliates, by this paragraph you assign ownership of that item, and all related rights to that item, to us and our affiliates and agree to take whatever action (including signing assignment or other documents) we request to evidence our and our affiliates' ownership or to help us and our affiliates obtain intellectual property rights in the item.

7. **EXCLUSIVE RELATIONSHIP.**

You acknowledge that we have granted you the Franchise in consideration of and reliance upon your agreement to deal exclusively with us. You therefore agree that, during this Agreement's term, neither you, any of your owners, nor any of your or your owners' immediate family members will:

(a)  have any direct or indirect interest as an owner – whether of record, beneficially, or otherwise – in a Competitive Business, wherever located or operating (except that equity ownership of less than five percent (5%) of a Competitive Business whose stock or other forms of ownership interest are publicly traded on a recognized United States stock exchange will not be deemed to violate this subparagraph);

(b)  perform services as a director, officer, manager, employee, consultant, representative, or agent for a Competitive Business, wherever located or operating;

(c)  recruit or hire any person then employed, or who was employed within the immediately preceding twenty-four (24) months, as a General Manager or Assistant Manager at a Center operated by us, any of our affiliates, or a franchise owner without obtaining the employer's prior written permission;

(d)  divert or attempt to divert any actual or potential business or customer of your Center to a Competitive Business; or

(e)  engage in any other activity which might injure the goodwill of the Marks and/or the Franchise System.

15

The term "Competitive Business" means (i) any business offering or selling digital and offset printing, copying, graphic design, electronic pre-press, binding, mailing services, promotional products and related products and services, or (ii) any business granting franchises or licenses to others to operate the types of businesses specified in subparagraph (i) (other than a Center operated under a franchise agreement with us). You agree to obtain similar covenants from the personnel we specify, including officers, directors, managers, and other employees attending our training program or having access to Confidential Information. We have the right to regulate the form of agreement that you use and to be a third party beneficiary of that agreement with independent enforcement rights.

8.   **CENTER OPERATIONS AND SYSTEM STANDARDS.**

A.   **CONDITION AND APPEARANCE OF YOUR CENTER.**

You agree that you will not use any part of the Premises for any purpose other than operating a Center in compliance with this Agreement, and that you will place or display at the Premises (interior and exterior) only those signs, emblems, designs, artwork, lettering, logos and display and advertising materials that we approve from time to time. You further agree to maintain the condition and appearance of your Center, its Operating Assets and the Premises in accordance with the System Standards and consistent with the image of a Center as an efficiently operated business offering high quality products and services and observing the highest standards of cleanliness and efficient, courteous service. Therefore, you agree to take, without limitation, the following actions during this Agreement's term at your expense: (a) thorough cleaning, repainting and redecorating of the interior and exterior of the Premises at intervals that we may prescribe; (b) interior and exterior repair of the Premises as needed; and (c) repair or replacement, at our direction, of damaged, worn-out or obsolete Operating Assets at intervals that we may prescribe (or, if we do not prescribe an interval for replacing any Operating Asset, as that Operating Asset needs to be repaired or replaced).

B.   **PRODUCTS AND SERVICES THE BUSINESS OFFERS**

You agree that you (1) will offer and sell from your Center the products and services that we periodically specify; (2) will not offer or sell at your Center, the Premises or any other location any products or services we have not authorized; and (3) will discontinue selling and offering for sale any products or services that we at any time disapprove.

C.   **MANAGEMENT OF THE BUSINESS**

Your Center shall be managed by you or, if you are an Entity, by the Managing Owner. You (or the Managing Owner if you are an Entity) agree to work full-time at your Center, to supervise the day-to-day operations of your Center and continuously exert your best efforts to promote and enhance your Center.

D.   **APPROVED PRODUCTS, SERVICES, AND SUPPLIERS.**

We reserve the right to periodically designate and approve standards, specifications, suppliers and/or distributors of the Operating Assets and the products and services that we periodically authorize for use at your Center. During this Agreement's term you must purchase

16

or lease all Operating Assets and other products and services for your Center only according to our standards and specifications and, if we require, only from suppliers or distributors that we designate or approve (which may include or be limited to us and/or our affiliates). You acknowledge and agree that we and/or our affiliates may derive revenue based on your purchases and leases (including, without limitation, from charging you for products and services we or our affiliates provide to you and from payments made to us or our affiliates by suppliers that we designate or approve for some or all of our franchisees).

If you want to use any Operating Assets or products that we have not yet evaluated or want to purchase any item from a supplier or distributor that we have not yet approved (for items that we require you to purchase from designated or approved suppliers or distributors), you first must submit sufficient information, specifications and samples for us to determine whether the item complies with our standards and specifications or the supplier or distributor meets our criteria. We may condition our approval of a supplier or distributor on requirements relating to product quality, prices, consistency, reliability, financial capability, labor relations, client relations, frequency of delivery, concentration of purchases, standards of service (including prompt attention to complaints) or other criteria. We reserve the right periodically to re-inspect the facilities and products of any approved supplier or distributor and to revoke our approval if the supplier or distributor does not continue to meet our criteria.

## E. <u>COMPLIANCE WITH LAWS AND GOOD BUSINESS PRACTICES.</u>

You must secure and maintain in force throughout this Agreement's term all required licenses, permits and certificates relating to your Center's operation and operate your Center in full compliance with all applicable laws, ordinances and regulations. You agree to comply and assist us in our compliance efforts, as applicable, with any and all laws, regulations, Executive Orders or otherwise relating to anti terrorist activities, including, without limitation, the U.S. Patriot Act, Executive Order 13224, and related U.S. Treasury and/or other regulations. In connection with such compliance efforts, you agree not to enter into any prohibited transactions and to properly perform any currency reporting and other activities relating to your Center as may be required by us or by law. You confirm that you are not listed in the Annex to Executive Order 13224 and agree not to hire any person so listed or have any dealing with a person so listed (the Annex is currently available at http://www.treasury.gov). You are solely responsible for ascertaining what actions must be taken by you to comply with all such laws, orders and/or regulations, and specifically acknowledge and agree that your indemnification responsibilities as provided in Section 16.D pertain to your obligations hereunder.

Your Center must in all dealings with its clients, suppliers, us and the public adhere to the highest standards of honesty, integrity, fair dealing and ethical conduct. You agree to refrain from any business or advertising practice which might injure our business or the goodwill associated with the Marks or other Centers. You must notify us in writing within three (3) business days of: (1) the commencement of any action, suit or proceeding relating to your Center; (2) the issuance of any order, writ, injunction, award or decree of any court, agency or other governmental instrumentality relating to your Center; (3) any notice of violation of any law, ordinance or regulation relating to your Center; (4) receipt of any notice of complaint from the Better Business Bureau, any local, state or federal consumer affairs department or division, or any other government or independent third party involving a complaint from a customer or

17

potential customer relating to your Center; and (5) written complaints from any customer or potential customer. You must immediately provide to us copies of any documentation you receive of events in (1) through (5) above and resolve the matter in a prompt and reasonable manner in accordance with good business practices.

F.   **INSURANCE.**

During the term of this Agreement you must maintain in force at your sole expense comprehensive public, general and motor vehicle liability and errors and omissions insurance against claims for bodily and personal injury, death and property damage caused by or occurring in connection with your Center's operation, all containing the minimum liability coverage we prescribe from time to time. We may periodically increase the amounts of coverage required under these insurance policies and/or require different or additional insurance coverages (including reasonable excess liability insurance) at any time to reflect inflation, identification of new risks, changes in law or standards of liability, higher damage awards or other relevant changes in circumstances. These insurance policies must name us and any affiliates we designate as additional named insureds and provide for thirty (30) days' prior written notice to us of a policy's material modification, cancellation or expiration. You routinely must furnish us copies of your Certificate of Insurance or other evidence of your maintaining this insurance coverage and paying premiums. If you fail or refuse to obtain and maintain the insurance we specify, in addition to our other remedies, we may (but need not) obtain such insurance for you and your Center on your behalf, in which event you shall cooperate with us and reimburse us for all premiums, costs and expenses we incur in obtaining and maintaining the insurance, plus a reasonable fee for our time incurred in obtaining such insurance.

G.   **COMPLIANCE WITH SYSTEM STANDARDS.**

You acknowledge and agree that operating and maintaining your Center according to System Standards are essential to preserve the goodwill of the Marks and the goodwill of all Centers. Therefore, you agree at all times to operate and maintain your Center according to each and every System Standard, as we periodically modify and supplement them. Though we retain the right to establish and periodically modify System Standards which you have agreed to maintain in the operation of your Center, you retain the right and sole responsibility for the day-to-day management and operation of your Center and the implementation and maintenance of System Standards at your Center. System Standards may regulate any aspect of your Center's operation and maintenance, including, but not limited to, any one or more of the following:

(1)   sales, marketing, advertising and promotional programs and materials and media used in these programs;

(2)   staffing levels for your Center and employee qualifications, training, dress and appearance (although you have sole responsibility and authority concerning employee selection and promotion, hours worked, rates of pay and other benefits, work assigned and working conditions);

(3)   use and display of the Marks;

(4)   days and hours of operation;

18

(5)     methods of payment that Centers may accept from clients;

(6)     participation in market research and testing and product and service development programs;

(7)     terms of the client contracts;

(8)     bookkeeping, accounting, data processing and record keeping systems and forms; formats, content and frequency of reports to us of sales, revenue, and financial performance and condition; and giving us copies of tax returns and other operating and financial information concerning the Franchise (we will use reasonable efforts to keep such records confidential);

(9)     types, amounts, terms and conditions of insurance coverage required for your business, including criteria for your insurance carriers; and

(10)    any other aspects of operating and maintaining your Center that we determine to be useful to preserve or enhance the efficient operation, image or goodwill of the Marks and Centers.

You agree that System Standards we prescribe in the Operations Manuals, or otherwise communicates to you in writing or another form, are part of this Agreement as if fully set forth within its text. All references to this Agreement include all System Standards as periodically modified. You acknowledge that our periodic modification of the System Standards (including, without limitation, changes to the hardware and software required for the Computer System), which may accommodate regional and/or local variations, may obligate you to invest additional capital in your Center and/or incur higher operating costs.

9.    **MARKETING.**

A.    **MARKETING FUND.**

We have established a marketing fund for Centers located in the United States and in Canada operating under the Allegra Print & Imaging, American Speedy Printing Center, Zippy Print, Instant Copy, and Speedy Printing Center brands (the "Allegra Marketing Fund"). We have established a separate marketing fund for Centers located in the United States operating under the Insty-Prints brand (the "Insty-Prints Marketing Fund"). (Unless otherwise indicated, the Allegra Marketing Fund and the Insty-Prints Marketing Fund are referred to herein each as a "Marketing Fund") We will use each Marketing Fund for advertising, marketing, and public relations programs and materials we deem appropriate. You agree to begin contributing to the applicable Marketing Fund in accordance with the Allegra and American Speedy Rider or the Insty-Prints Rider, whichever is applicable. Centers that we or our affiliates own in the United States or Canada (but not elsewhere) will contribute to the appropriate Marketing Fund on the same percentage basis as franchise owners.

We will direct all programs that each Marketing Fund finances, with sole control over the creative concepts, materials, and endorsements used and their geographic, market, and media placement and allocation. Each Marketing Fund may pay for preparing and producing video,

19

audio, and written materials and electronic media; developing, implementing, and maintaining a Franchise System Website (as defined in Subsection D below) and/or related strategies; administering regional and multi-regional marketing and advertising programs, including, without limitation, purchasing trade journal, direct mail, and other media advertising and using advertising, promotion, and marketing agencies and other advisors to provide assistance; and supporting public relations, market research, and other advertising, promotion, and marketing activities. The Marketing Fund to which you contribute periodically will give you samples of advertising, marketing, and promotional formats and materials at no cost. We will sell you multiple copies of these materials at our direct cost of producing them, plus any related shipping, handling, and storage charges.

We will account for each Marketing Fund separately from our other funds and not use either Marketing Fund for any of our general operating expenses. However, we may use each Marketing Fund to pay the reasonable salaries and benefits of personnel who manage and administer such Marketing Fund, such Marketing Fund's other administrative costs, travel expenses of personnel while they are on Marketing Fund business, meeting costs, overhead relating to Marketing Fund business, and other expenses that we incur in activities reasonably related to administering or directing such Marketing Fund and its programs, including, without limitation, conducting market research, public relations, preparing advertising, promotion, and marketing materials, and collecting and accounting for Marketing Fund contributions.

The Marketing Funds will not be our asset. The Marketing Funds are not trusts. We do not owe any fiduciary obligation to you for administering the Marketing Funds or any other reason. We will hold all Marketing Fund contributions for the benefit of the contributors and use contributions for the purposes described in this Subsection. Each Marketing Fund may spend in any fiscal year more or less than the total Marketing Fund contributions in that year, borrow from us or others (paying reasonable interest) to cover deficits, or invest any surplus for future use. We will use all interest earned on each Marketing Fund contributions to pay costs before using such Marketing Fund's other assets. We will prepare an annual, unaudited statement of Marketing Fund collections and expenses and give you the statement upon written request. We may have either Marketing Fund audited annually, at the Marketing Fund's expense, by an independent certified public accountant. We may incorporate either Marketing Fund or operate it through a separate entity whenever we deem appropriate. The successor entity will have all of the rights and duties specified in this Subsection.

We intend for each Marketing Fund to maximize recognition of the applicable Marks and patronage of Centers contributing to such Marketing Fund. Although we will try to use each Marketing Fund to develop advertising and marketing materials and programs, and to place advertising and marketing, that will benefit all Centers contributing to the Marketing Fund, we need not ensure that Marketing Fund expenditures in or affecting any geographic area are proportionate or equivalent to Marketing Fund contributions by Centers operating in that geographic area or that any Center benefits directly or in proportion to its Marketing Fund contribution from the development of advertising and marketing materials or the placement of advertising and marketing. We have the right, but no obligation, to use collection agents and institute legal proceedings to collect Marketing Fund contributions at the Marketing Fund's expense. We also may forgive, waive, settle, and compromise all claims by or against a Marketing Fund. Except as expressly provided in this Subsection, we assume no direct or

20

indirect liability or obligation to you for collecting amounts due to, maintaining, directing, or administering the Marketing Funds.

We may at any time defer or reduce contributions of a Center franchise owner and, upon thirty (30) days' prior notice to you, reduce or suspend Marketing Fund contributions and operations for one or more periods of any length and terminate (and, if terminated, reinstate) the Marketing Fund. If we terminate a Marketing Fund, we will distribute all unspent monies to our franchise owners who contribute to such Marketing Fund, and to us and our affiliates, in proportion to their, and our, respective Marketing Fund contributions during the preceding twelve (12) month period.

B. **BY YOU.**

You agree to list and advertise your Center in at least one (1) recommended classified telephone directory distributed within your Center's market area (in the business classifications we prescribe from time to time) and to use form of classified telephone directory advertisement approved by us. If other Centers are located within the directory's distribution area, we may require you to participate in a collective advertisement with those other Centers and to pay your share of that collective advertisement. Your local advertising and promotion must follow our guidelines. You may not develop, maintain, or authorize any Website that mentions or describes you or your Center or displays any of the Marks.

You agree that your advertising, promotion, and marketing will be completely clear, factual, and not misleading and conform to both the highest standards of ethical advertising and marketing and the advertising and marketing policies that we prescribe from time to time. Before you use them, you agree to send us for approval samples of all advertising, promotional, and marketing materials which we have not prepared or previously approved. If you do not receive written disapproval within twenty (20) days after we receive the materials, they are deemed to be approved. You may not use any advertising, promotional, or marketing materials that we have not approved or have disapproved.

C. **LOCAL ADVERTISING COOPERATIVE.**

Subject to the terms and conditions of this Subsection C, you agree that we may establish a local advertising cooperative ("Local Advertising Cooperative") in geographical areas in which two (2) or more Centers are operating under the same brand. The Local Advertising Cooperative members in any area will include all *Allegra*® Print & Imaging, *American Speedy*® Printing or *Insty-Prints*® franchisees, as applicable, in such area. Each Local Advertising Cooperative will be organized and governed in a form and manner, and begin operating on a date, that we determine in advance. We may change, dissolve and merge Local Advertising Cooperatives. Each Local Advertising Cooperative's purpose is, with our approval, to administer advertising programs and develop advertising, marketing and promotional materials for the area that the Local Advertising Cooperative covers. If, as of the time you sign this Agreement, we have established a Local Advertising Cooperative for the geographic area in which your Center is located, or if we establish a Local Advertising Cooperative in that area during this Agreement's term, you agree to sign the documents we require to become a member of the Local Advertising Cooperative and to participate in the Local Advertising Cooperative as those documents require.

21

Once a Local Advertising Cooperative is established, in which you are required to participate, you agree to contribute to the Local Advertising Cooperative in accordance with the terms of the Allegra and American Speedy Rider or the Insty-Prints Rider, whichever, is applicable. Your Local Advertising Cooperative contribution is payable in the same manner as the Royalty. These contributions may be capped based on the provisions of the by-laws adopted by the local advertising cooperative, subject to our approval. You will pay these monies to us electronically and we will remit them periodically to the Local Advertising Cooperative.

Each Center contributing to the Local Advertising Cooperative's area will have one (1) vote. The Local Advertising Cooperative may not use any advertising, marketing or promotional plans or materials without our prior written consent. We agree to assist in the formulation of marketing plans and programs, which will be implemented under the direction of the Local Advertising Cooperative. You acknowledge and agree that, subject to our approval, the Local Advertising Cooperative will have sole discretion over the creative concepts, materials and endorsements used by it. You agree that the Local Advertising Cooperative assessments may be used to pay the costs of preparing and producing video, audio and written advertising and direct sales materials for Centers of your type in your area of the country; purchasing direct mail and other media advertising for Centers of your type in that area of the country; and implementing direct sales programs, and employing marketing, advertising and public relations firms to assist with the development and administration of marketing programs in Centers of your type in your area of the country.

The monies collected by us on behalf of a Local Advertising Cooperative will be accounted for separately by us from our other funds received by us under this Agreement and will not be used to defray any of our general operating expenses. You agree to submit to us and the Local Advertising Cooperative any reports that we or the Local Advertising Cooperative requires.

You understand and acknowledge that your Center may not benefit directly or in proportion to its contribution to the Local Advertising Cooperative from the development and placement of advertising and the development of marketing materials. Local Advertising Cooperatives for *Allegra*® Print & Imaging Centers, *American Speedy*® Printing Centers and *Insty-Prints*® Centers will be developed separately and no cooperative will benefit the others. We will have the right, but not the obligation, to use collection agents and to institute legal proceedings to collect amounts owed to the Local Advertising Cooperative on behalf of and at the expense of the Local Advertising Cooperative and to forgive, waive, settle and compromise all claims by or against the Local Advertising Cooperative. Except as expressly provided in this Subsection, we assume no direct or indirect liability or obligation to you with respect to the maintenance, direction or administration of the Local Advertising Cooperative.

D.   **FRANCHISE SYSTEM WEBSITE.**

We have established a Website to advertise, market, and promote Centers, the products and services that they offer and sell, and/or the Center franchise opportunity (a "Franchise System Website"). We may, but are not obligated to, provide you with a webpage on the Franchise System Website that references your Center. If we provide you with a webpage on the Franchise System Website, you must: (i) provide us the information and materials we request to

22

develop, update, and modify your webpage; (ii) notify us whenever any information on your webpage is not accurate; (iii) if we give you the right to modify your webpage, notify us whenever you change the context of your webpage; and (iv) pay our then current initial fee and monthly maintenance fee for the webpage. We will own all intellectual property and other rights in the Franchise System Website, including your webpage, and all information they contain (including, without limitation, the domain name or URL for your webpage, the log of "hits" by visitors, and any personal or business data that visitors supply).

We will maintain the Franchise System Website and may use the Marketing Fund's assets to develop, maintain, and update the Franchise System Website. We periodically may update and modify the Franchise System Website (including your webpage). You acknowledge that we have final approval rights over all information on the Franchise System Website (including your webpage). We may implement and periodically modify System Standards relating to the Franchise System Website.

Even if we provide you a webpage on our Franchise System Website, we will only maintain such webpage while you are in full compliance with this Agreement and all System Standards we implement (including, without limitation, those relating to the Franchise System Website). If you are in default of any obligation under this Agreement or our System Standards, then we may, in addition to our other remedies, temporarily remove your webpage from the Franchise System Website until you fully cure the default. We will permanently remove your webpage from the Franchise System Website upon this Agreement's expiration or termination.

All advertising, marketing, and promotional materials that you develop for your Center must contain notices of the Franchise System Website's domain name in the manner we designate. You may not develop, maintain, or authorize any other Website that mentions or describes you or your Center or displays any of the Marks.

E.   **MARKETSMART PROGRAM.**

We have established a comprehensive, turnkey direct mail marketing program (the "MarketSmart Program") which is designed and administered by us. The MarketSmart Program currently includes direct mailers, newsletters, lead reports, customer satisfaction surveys, fulfillment and a sweepstakes program. You must participate in the MarketSmart Program implemented by us. Participation may require you to incur additional costs. We reserve the right to periodically alter the MarketSmart Program. We may also discontinue the MarketSmart Program upon notice to you. We will establish the price for all materials and service we provide under the MarketSmart Program which we may change from time to time.

10.   **RECORDS, REPORTS, AND FINANCIAL STATEMENTS.**

You agree to establish and maintain at your own expense a bookkeeping, accounting, and recordkeeping system conforming to the requirements and formats we prescribe from time to time. We may require you to use a Computer System to maintain certain sales data and other information. You agree to give us in the manner and format that we prescribe from time to time:

(a)   on or before the fifth (5th) day of each calendar month, a report on your Center's Total Monthly Receipt (if your Center is an American Speedy or Allegra Center)

23

or Gross Sales (if your Center is an Insty-Prints center) during the preceding calendar month;

      (b)     within thirty (30) days after the end of each calendar quarter, the operating statements, financial statements, statistical reports, purchase records, and other information we request regarding you and your Center covering the previous calendar quarter and the fiscal year to date;

      (c)     within ninety (90) days after the end of each calendar year, annual profit and loss and source and use of funds statements and a balance sheet for your Center as of the end of that calendar year; and

      (d)     within ten (10) days after our request, exact copies of federal and state income tax returns, sales tax returns, and any other forms, records, books, and other information we periodically require relating to your Center and the Franchise.

You agree to verify and sign each report and financial statement in the manner we prescribe. We may disclose data derived from these reports. Moreover, we may, as often as we deem appropriate (including on a daily basis), access the Computer System and retrieve all information relating to your Center's operation. You agree to preserve and maintain all records in a secure location at your Center for at least three (3) years (including, but not limited to, sales checks, purchase orders, invoices, payroll records, customer lists, check stubs, sales tax records and returns, cash receipts and disbursement journals, and general ledgers). We may require you to have audited financial statements prepared annually during this Agreement's term.

    You agree to participate in our operating ratio studies by providing such data and information as we may require, and in the form and manner we require from time to time. You further agree that we shall have the right, in our sole discretion, to include such data and information in our annual operating ratio study.

11.   **INSPECTIONS AND AUDITS.**

    A.   **OUR RIGHT TO INSPECT YOUR CENTER.**

    To determine whether you and your Center are complying with this Agreement and all System Standards, we and our designated agents or representatives, may at all times and without prior notice to you:

      (1)     inspect your Center;

      (2)     photograph your Center and observe and videotape your Center's operation for consecutive or intermittent periods we deem necessary;

      (3)     remove samples of any products and supplies;

      (4)     interview your Center's personnel and customers; and

24

(5)   inspect and copy any books, records, and documents relating to your Center's operation.

You agree to cooperate with us fully. If we exercise any of these rights, we will not interfere unreasonably with your Center's operation. You agree to present to your customers the evaluation forms that we periodically prescribe and to participate and/or request your customers to participate in any surveys performed by or for us.

### B.   **OUR RIGHT TO AUDIT.**

We may at any time during your business hours, and without prior notice to you, examine your (if you are an Entity) and your Center's business, bookkeeping, and accounting records, sales and income tax records and returns, and other records. You agree to cooperate fully with our representatives and independent accountants in any examination. If any examination discloses an understatement of your Center's Gross Sales or Total Monthly Receipts (whichever is applicable), you agree to pay us, within fifteen (15) days after receiving the examination report, the Royalty and Marketing Fund contributions due on the amount of the understatement, plus our service charges and interest on the understated amounts from the date originally due until the date of payment. Furthermore, if an examination is necessary due to your failure to furnish reports, supporting records, or other information as required, or to furnish these items on a timely basis, or if our examination reveals a Royalty or Marketing Fund contribution understatement exceeding five percent (5%) of the amount that you actually reported to us for the period examined, you agree to reimburse us for the costs of the examination, including, without limitation, the charges of attorneys and independent accountants and the travel expenses, room and board, and compensation of our employees. These remedies are in addition to our other remedies and rights under this Agreement and applicable law.

### 12.   **TRANSFER.**

#### A.   **BY US.**

You acknowledge that we maintain a staff to manage and operate the Franchise System and that staff members can change as employees come and go. You represent that you have not signed this Agreement in reliance on any particular shareholder, member, director, officer, or employee remaining with us in that capacity. We may change our ownership or form and/or assign this Agreement and any other agreement to a third party without restriction.

#### B.   **BY YOU.**

You understand and acknowledge that the rights and duties this Agreement creates are personal to you (or to your owners if you are an Entity) and that we have granted you the Franchise in reliance upon our perceptions of your (or your owners') individual or collective character, skill, aptitude, attitude, business ability, and financial capacity. Accordingly, neither this Agreement (or any interest in this Agreement), your Center or substantially all of its assets, any ownership interest in you (regardless of its size), nor any ownership interest in any of your owners (if such owners are legal entities) may be transferred without our prior written approval. A transfer of your Center's ownership, possession, or control, or substantially all of its assets, may be made only with a transfer of this Agreement. Any transfer without our approval is a

25

breach of this Agreement and has no effect. In this Agreement, the term "transfer" includes a voluntary, involuntary, direct, or indirect assignment, sale, gift, or other disposition of any interest in:

    (1)    this Agreement;

    (2)    you;

    (3)    your Center or substantially all of its assets;

    (4)    your owners (if such owners are legal entities).

An assignment, sale, gift, or other disposition includes the following events:

    (a)    transfer of ownership of capital stock, a partnership or membership interest, or another form of ownership interest;

    (b)    merger or consolidation or issuance of additional securities or other forms of ownership interest;

    (c)    any sale of a security convertible to an ownership interest;

    (d)    transfer of an interest in you, this Agreement, your Center or substantially all of its assets, or your owners in a divorce, insolvency, or entity dissolution proceeding or otherwise by operation of law;

    (e)    if you, one of your owners, or an owner of one of your owners dies, a transfer of an interest in you, this Agreement, your Center or substantially all of its assets, or your owner by will, declaration of or transfer in trust, or under the laws of intestate succession; or

    (f)    pledge of this Agreement (to someone other than us) or of an ownership interest in you or your owners as security, foreclosure upon your Center, or your transfer, surrender, or loss of your Center's possession, control, or management.

C.    **CONDITIONS FOR APPROVAL OF TRANSFER.**

If you (and your owners) are in full compliance with this Agreement, then, subject to the other provisions of this Section 12, we will approve a transfer that meets all of the requirements in this Subsection. A non-controlling ownership interest in you or your owners (determined as of the date on which the proposed transfer will occur) may be transferred if the proposed transferee and its direct and indirect owners (if the transferee is an Entity) are of good character and meet our then applicable standards for Center franchise owners (including no ownership interest in or performance of services for a Competitive Business). If the proposed transfer is of this Agreement or a controlling ownership interest in you or one of your owners, or is one of a series of transfers (regardless of the time period over which these transfers take place) which in the aggregate transfer this Agreement or a controlling ownership interest in you or one of your

26

owners, then all of the following conditions must be met before or concurrently with the effective date of the transfer:

(1)    the transferee has sufficient business experience, aptitude, and financial resources to operate your Center;

(2)    you have paid all Royalty, Marketing Fund and advertising cooperative contributions, and other amounts owed to us, our affiliates, and third party vendors; have submitted all required reports and statements;

(3)    you have not violated any provision of this Agreement, the Lease, or any other agreement with us during both the sixty (60) day period before you requested our consent to the transfer and the period between your request and the effective date of the transfer;

(4)    neither the transferee nor its owners (if the transferee is an Entity) or affiliates have an ownership interest (direct or indirect) in or perform services for a Competitive Business;

(5)    the transferee (or its managing owner) satisfactorily complete our training program;

(6)    your landlord allows you to transfer the Lease or sublease the Premises to the transferee;

(7)    the transferee agrees (if the transfer is of this Agreement) to upgrade, remodel, and refurbish your Center in accordance with our current requirements and specifications for Centers within forty-five (45) days after the effective date of the transfer (we will advise the transferee before the effective date of the transfer of the specific actions that it must take within this time period);

(8)    the transferee shall (if the transfer is of this Agreement), or you shall (if the transfer is of a controlling ownership interest in you or one of your owners), sign our then current form of franchise agreement and related documents, any and all of the provisions of which may differ materially from any and all of those contained in this Agreement;

(9)    you pay us a transfer fee of the greater of $10,000 or 5% of the purchase price if you have solicited our assistance in finding a transferee and we provide such assistance or $1,500 if you did not solicit our assistance in finding a transferee. However, no transfer fee is due if, upon a spouse's death, that spouse's interest in this Agreement and your Center, or ownership in you, is transferred to the surviving spouse;

(10)    you (and your transferring owners) sign a general release, in a form satisfactory to us, of any and all claims against us and our shareholders, members, officers, directors, employees, and agents;

27

(11)   we have determined that the purchase price and payment terms will not adversely affect the transferee's operation of your Center;

(12)   if you or your owners finance any part of the purchase price, you and/or your owners agree that all of the transferee's obligations under promissory notes, agreements, or security interests reserved in your Center are subordinate to the transferee's obligation to pay Royalty, Marketing Fund contributions, and other amounts due to us, our affiliates, and third party vendors and otherwise to comply with this Agreement;

(13)   you and your transferring owners (and your and their immediate family members) will not, for two (2) years beginning on the transfer's effective date, engage in any of the activities proscribed in Subsection 15.D. below; and

(14)   you and your transferring owners will not directly or indirectly at any time or in any manner (except with respect to other Centers you own and operate) identify yourself or themselves or any business as a current or former Center or as one of our franchise owners; use any Mark, any colorable imitation of a Mark, or other indicia of a Center in any manner or for any purpose; or utilize for any purpose any trade name, trade or service mark, or other commercial symbol that suggests or indicates a connection or association with us.

We may review all information regarding your Center that you give the transferee, correct any information that we believe is inaccurate, and give the transferee copies of any reports that you have given us or we have made regarding your Center.

D.   **TRANSFER TO A WHOLLY-OWNED CORPORATION OR LIMITED LIABILITY COMPANY.**

Notwithstanding Subsection C above, if you are in full compliance with this Agreement, you may transfer this Agreement to a corporation or limited liability company which conducts no business other than your Center and, if applicable, other Centers, in which you maintain management control, and of which you own and control one hundred percent (100%) of the equity and voting power of all issued and outstanding ownership interests, provided that all of your Center's assets are owned, and your Center's business is conducted, only by that single corporation or limited liability company.  The corporation or limited liability company must expressly assume all of your obligations under this Agreement.  Transfers of ownership interests in the corporation or limited liability company are subject to Subsection C above.  You agree to remain personally liable under this Agreement as if the transfer to the corporation or limited liability company did not occur.

E.   **YOUR DEATH OR DISABILITY.**

(1)   **Transfer Upon Death or Disability.**  Upon your or your Managing Owner's death or disability, your or the Managing Owner's executor, administrator, conservator, guardian, or other personal representative must transfer your interest in this Agreement, or the Managing Owner's ownership interest in you, to a third party (which may be your or the Managing Owner's heirs, beneficiaries, or devisees).  That transfer

28

must be completed within a reasonable time, not to exceed nine (9) months from the date of death or disability, and is subject to all of the terms and conditions in this Section 12. A failure to transfer your interest in this Agreement or the Managing Owner's ownership interest in you within this time period is a breach of this Agreement. The term "disability" means a mental or physical disability, impairment, or condition that is reasonably expected to prevent or actually does prevent you or the Managing Owner from supervising your Center's management and operation.

(2)  **Operation Upon Death or Disability.**  If, upon your or the Managing Owner's death or disability, a manager approved by us is not managing your Center, your or the Managing Owner's executor, administrator, conservator, guardian, or other personal representative must within a reasonable time, not to exceed fifteen (15) days from the date of death or disability, appoint a manager. The manager must complete our standard training program at your expense. A new Managing Owner acceptable to us also must be appointed for your Center within thirty (30) days. If, in our judgment, your Center is not being managed properly any time after your or the Managing Owner's death or disability, we may, but need not, assume your Center's management (or appoint a third party to assume its management). All funds from your Center's operation while it is under our (or the third party's) management will be kept in a separate account, and all expenses will be charged to this account. We may charge you (in addition to the Royalty, Marketing Fund contributions, and other amounts due under this Agreement) a reasonable per diem fee plus our (or the third party's) direct out-of-pocket costs and expenses, if we (or a third party) assume your Center's management under this subparagraph. We (or a third party) have a duty to utilize only reasonable efforts and will not be liable to you or your owners for any debts, losses, or obligations your Center incurs, or to any of your creditors for any products, other assets, or services your Center purchases, while we (or a third party) manage it.

F.  **EFFECT OF CONSENT TO TRANSFER.**

Our consent to a transfer of this Agreement and your Center, or any interest in you or your owners, is not a representation of the fairness of the terms of any contract between you and the transferee, a guarantee of your Center's or transferee's prospects of success, or a waiver of any claims we have against you (or your owners) or of our right to demand full compliance by you and the transferee with this Agreement.

G.  **OUR RIGHT OF FIRST REFUSAL.**

If you (or any of your owners) at any time determine to sell or transfer for consideration an interest in this Agreement and your Center, or an ownership interest in you (except to or among your current owners, which is not subject to this Subsection), in a transaction that otherwise would be allowed under Subsections 12.B. and C above, you (or your owners) agree to obtain from a responsible and fully disclosed buyer, and send us, a true and complete copy of a bona fide, executed written offer (which may include a letter of intent) relating exclusively to an interest in you or in this Agreement and your Center. The offer must include details of the payment terms of the proposed sale and the sources and terms of any financing for the proposed purchase price. To be a valid, bona fide offer, the proposed purchase price must be in a dollar

29

amount, and the proposed buyer must submit with its offer an earnest money deposit equal to five percent (5%) or more of the offering price. The right of first refusal process will not be triggered by a proposed transfer that would not be allowed under Subsections B and C above. We may require you (or your owners) to send us copies of any materials or information sent to the proposed buyer or transferee regarding the possible transaction.

We may, by written notice delivered to you or your selling owner(s) within thirty (30) days after we receive both an exact copy of the offer and all other information we request, elect to purchase the interest offered for the price and on the terms and conditions contained in the offer, provided that:

(1)    we may substitute cash for any form of payment proposed in the offer (such as ownership interests in a privately-held entity);

(2)    our credit will be deemed equal to the credit of any proposed buyer (meaning that, if the proposed consideration includes promissory notes, we or our designee may provide promissory notes with the same terms as those offered by the proposed buyer);

(3)    we will have an additional thirty (30) days to prepare for closing after notifying you of our election to purchase; and

(4)    we must receive, and you and your owners agree to make, all customary representations and warranties given by the seller of the assets of a business or the ownership interests in a legal entity, as applicable, including, without limitation, representations and warranties regarding:

(a)    ownership and condition of and title to ownership interests and/or assets;

(b)    liens and encumbrances relating to ownership interests and/or assets; and

(c)    validity of contracts and the liabilities, contingent or otherwise, of the entity whose assets or ownership interests are being purchased.

If we exercise our right of first refusal, you and your selling owner(s) (and your and their immediate family members) agree that, for two (2) years beginning on the closing date, you and they will be bound by the non-competition covenant contained in Subsection 15.D. below. We have the unrestricted right to assign this right of first refusal to a third party, who then will have the rights described in this Subsection.

If we do not exercise our right of first refusal, you or your owners may complete the sale to the proposed buyer on the original offer's terms, but only if we otherwise approve the transfer in accordance with, and you (and your owners) and the transferee comply with the conditions in, Subsections B and C above. This means that, even if we do not exercise our right of first refusal (whether or not it is properly triggered as provided above), if the proposed transfer otherwise would not be allowed under Subsections B and C above, you (or your owners) may not move forward with the transfer at all.

30

If you do not complete the sale to the proposed buyer within sixty (60) days after we notify you that we do not intend to exercise our right of first refusal, or if there is a material change in the terms of the sale (which you agree to tell us promptly), we or our designee will have an additional right of first refusal during the thirty (30) day period following either the expiration of the sixty (60) day period or our receipt of notice of the material change(s) in the sale's terms, either on the terms originally offered or the modified terms, at our or our designee's option.

13.    **EXPIRATION OF THIS AGREEMENT.**

    A.    **YOUR RIGHT TO ACQUIRE A SUCCESSOR FRANCHISE.**

When this Agreement expires:

    (1)    if you (and each of your owners) have substantially complied with this Agreement during its term; and

    (2)    if you (and each of your owners) are, both on the date you give us written notice of your election to acquire a successor franchise (as provided in Subsection 13.B. below) and on the date on which the term of the successor franchise would commence, in full compliance with this Agreement and all System Standards; and

    (3)    provided that (a) you maintain possession of and agree (regardless of cost) to remodel and/or expand your Center, add or replace improvements and Operating Assets, and otherwise modify your Center as we require to comply with System Standards then applicable for new Centers, or (b) at your option, you secure a substitute premises that we approve and you develop those premises according to System Standards then applicable for Centers,

then you may acquire a successor franchise to operate your Center as a Center for an additional term of twenty (20) years.  You agree to sign the franchise agreement we then use to grant franchises for Centers (modified as necessary to reflect the fact that it is for a successor franchise), which may contain provisions that differ materially from any and all of those contained in this Agreement; provided that we will waive the initial franchise fee.  If you (and each of your owners) are not, both on the date you give us written notice of your election to acquire a successor franchise and on the date on which the term of the successor franchise commences, in full compliance with this Agreement and all System Standards, you acknowledge that we need not grant you a successor franchise, whether or not we had, or chose to exercise, the right to terminate this Agreement during its term under Subsection 14.B.

    B.    **GRANT OF A SUCCESSOR FRANCHISE.**

You agree to give us written notice of your election to acquire a successor franchise no more than two hundred twenty (220) days and no less than one hundred eighty (180) days before this Agreement expires.  We agree to give you written notice ("Our Notice"), not more than ninety (90) days after we receive your notice, of our decision:

    (1)    to grant you a successor franchise;

31

(2)     to grant you a successor franchise on the condition that you correct existing deficiencies of your Center or in your operation of your Center;

(3)     not to grant you a successor franchise based on our determination that you and your owners have not substantially complied with this Agreement during its term or were not in full compliance with this Agreement and all System Standards on the date you gave us written notice of your election to acquire a successor franchise; or

(4)     not to grant you a successor franchise because we no longer maintain a franchise program for an *Allegra®* Print & Imaging center, *American Speedy®* Printing center or *Insty-Prints®* center, whichever is applicable.

If applicable, Our Notice will:

(a)     describe the remodeling, expansion, improvements, and/or modifications required to bring your Center into compliance with then applicable System Standards for new Centers; and

(b)     state the actions you must take to correct operating deficiencies and the time period in which you must correct these deficiencies.

If we elect not to grant you a successor franchise, Our Notice will describe the reasons for our decision.  If we elect to grant you a successor franchise, your right to acquire a successor franchise is subject to your full compliance with all of the terms and conditions of this Agreement through the date of its expiration, in addition to your compliance with the obligations described in Our Notice.

If Our Notice states that you must cure certain deficiencies of your Center or its operation as a condition to our granting you a successor franchise, we will give you written notice of our decision not to grant a successor franchise, based upon your failure to cure those deficiencies, not less than sixty (60) days before this Agreement expires, provided, however, that we need not give you this sixty (60) days' notice if we decide not to grant you a successor franchise due to your breach of this Agreement during the sixty (60) day period before it expires.  If we fail to give you:

(i)     notice of deficiencies in your Center, or in your operation of your Center, within ninety (90) days after we receive your timely election to acquire a successor franchise (if we elect to grant you a successor franchise under subparagraphs (2) and (b) above); or

(ii)     notice of our decision not to grant a successor franchise at least sixty (60) days before this Agreement expires, if this notice is required,

we may extend this Agreement's term for the time period necessary to give you either reasonable time to correct deficiencies or the sixty (60) days' notice of our refusal to grant a successor franchise.  If you fail to notify us of your election to acquire a successor franchise within the prescribed time period, we need not grant you a successor franchise.

32

C.   **AGREEMENTS/RELEASES.**

If you satisfy all of the other conditions for a successor franchise, you and your owners agree to execute the form of franchise agreement and any ancillary agreements we then customarily use in granting franchises for Centers (modified as necessary to reflect the fact that it is for a successor franchise), which may contain provisions that differ materially from any and all of those contained in this Agreement.   You and your owners further agree to sign general releases, in a form satisfactory to us, of any and all claims against us and our shareholders, officers, directors, employees, agents, successors, and assigns.   We will consider your or your owners' failure to sign these agreements and releases and to deliver them to us for acceptance and execution (together with the successor franchise fee) within thirty (30) days after their delivery to you to be an election not to acquire a successor franchise.

14.   **TERMINATION OF AGREEMENT.**

A.   **BY YOU.**

(1)   If you and your owners are fully complying with this Agreement and we materially fail to comply with this Agreement and do not (i) correct the failure within thirty (30) days after you deliver written notice of the material failure to us or, (ii) if we cannot correct the failure within thirty (30) days, give you within thirty (30) days after your notice reasonable evidence of our effort to correct the failure within a reasonable time, you may terminate this Agreement effective an additional thirty (30) days after you deliver to us written notice of termination.

(2)   Prior to the expiration of the term of this Agreement and if you have materially complied with all of your obligations under this Agreement, you may terminate this Agreement at any time upon sixty (60) days prior written notice to us upon the payment of a termination fee ("Termination Fee").   The Termination Fee shall be an amount equal to the greater of Fifty-Five Thousand Dollars ($55,000.00) (as adjusted from time to time by us to reflect any changes in the Consumer Price Index) or twenty-five percent (25%) of the Total Monthly Receipts or Gross Sales, whichever is applicable, of your Center for the twelve (12) months immediately preceding the effective date of your termination of this Agreement.   The Termination Fee shall be due and payable to us as of the effective date of your termination of this Agreement.   You shall comply with your post-termination obligations under this Agreement, including, without limitation, your obligations under Section 15 of this Agreement; provided, however, you will not be required to comply with the covenant not to compete under Section 15.D. of this Agreement.   You acknowledge and agree that the Termination Fee shall be reasonable compensation to us for our lost opportunity to benefit from the franchise relationship and is a reasonable reflection of the value of the loss of the franchise to us, including without limitation, lost profits from the Royalty and other fees. The Termination Fee shall be paid in addition to any other amounts owed us under this Agreement and there shall be no deduction or set–off of any kind with respect to the Termination Fee.

ALLEGRA NETWORK 08/2005
–CHGO1:30557946.v2

(3)    Your termination of this Agreement other than according to this Section 14.A. will be deemed a termination without cause and a breach of this Agreement.

B.    **BY US.**

We may terminate this Agreement, effective upon delivery of written notice of termination to you, if:

(1)    you (or any of your owners) have made or make any material misrepresentation or omission in acquiring the Franchise or operating your Center;

(2)    you do not locate, and sign a Lease or purchase document for, an acceptable site for the Premises within ninety (90) days after the Effective Date;

(3)    you do not open your Center for business within one hundred twenty (120) days after the Effective Date;

(4)    you (or your Managing Owner) do not satisfactorily complete initial training;

(5)    you abandon or fail actively to operate your Center for three (3) or more consecutive business days, unless you close your Center for a purpose we approve;

(6)    you surrender or transfer control of your Center's operation without our prior written consent;

(7)    you (or any of your owners) are or have been convicted by a trial court of, or plead or have pleaded no contest or guilty to, a felony;

(8)    you fail to maintain the insurance we require and do not correct the failure within ten (10) days after we deliver written notice of that failure to you;

(9)    you (or any of your owners) engage in any dishonest or unethical conduct which, in our opinion, adversely affects your Center's reputation or the goodwill associated with the Marks;

(10)    you (or any of your owners or, if one or more of your owners is an Entity, the owner of a controlling interest in that Entity) make or attempt to make an unauthorized assignment of this Agreement, an ownership interest in you (or your owner), or your Center;

(11)    you lose the right to occupy the Premises and fail (a) to begin immediately to look for a substitute site or (b) to locate a substitute site, and to begin operating your Center from that substitute site, within ninety (90) days;

(12)    you (or any of your owners) knowingly make any unauthorized use or disclosure of any part of the Operations Manuals or any other Confidential Information;

34

(13)   you violate any law, ordinance, rule or regulation of a governmental agency in connection with the operation of your Center and fail to correct such violation within seventy-two (72) hours after you receive notice from us or any other party;

(14)   you fail to pay us (or our affiliates) any amounts due and do not correct the failure within ten (10) days after we deliver written notice of that failure to you;

(15)   you fail to pay when due any federal or state income, service, sales, or other taxes due on your Center's operation, unless you are in good faith contesting your liability for these taxes;

(16)   you understate your Center's Total Monthly Receipts or Gross Sales, whichever is applicable, three (3) times or more during this Agreement's term or by more than five percent (5%) on any one occasion;

(17)   you (or any of your owners) (a) fail on three (3) or more separate occasions within any twelve (12) consecutive month period to comply with this Agreement, whether or not we notify you of the failures, and, if we do notify you of the failures, whether or not you correct the failures after our delivery of notice to you; or (b) fail on two (2) or more separate occasions within any six (6) consecutive month period to comply with the same obligation under this Agreement, whether or not we notify you of the failures, and, if we do notify you of the failures, whether or not you correct the failures after our delivery of notice to you;

(18)   you make an assignment for the benefit of creditors or admit in writing your insolvency or inability to pay your debts generally as they become due; you consent to the appointment of a receiver, trustee, or liquidator of all or the substantial part of your property; your Center is attached, seized, subjected to a writ or distress warrant, or levied upon, unless the attachment, seizure, writ, warrant, or levy is vacated within thirty (30) days; or any order appointing a receiver, trustee, or liquidator of you or your Center is not vacated within thirty (30) days following the order's entry;

(19)   you file a petition in bankruptcy or a petition in bankruptcy is filed against you;

(20)   you (or any of your owners) fail to comply with anti-terrorism laws, ordinances, regulations and Executive Orders;

(21)   you (or any of your owners) fail to comply with any other provision of this Agreement or any System Standard and do not correct the failure within thirty (30) days after we deliver written notice of the failure to you; or

(22)   You fail to comply with any other agreement with us or our affiliate and do not correct such failure within the applicable cure period, if any.

35

C.     **ASSUMPTION OF MANAGEMENT.**

We have the right (but not the obligation), under the circumstances described below, to enter the Premises and assume your Center's management (or to appoint a third party to assume its management) for any period of time we deem appropriate.  If we (or a third party) assume your Center's management under subparagraphs (1) and (2) below, you agree to pay us (in addition to the Royalty, Marketing Fund contributions, and other amounts due under this Agreement) a reasonable per diem fee, plus our (or the third party's) direct out-of-pocket costs and expenses, for up to sixty (60) days after we assume management.  If we (or a third party) assume your Center's management, you acknowledge that we (or the third party) will have a duty to utilize only reasonable efforts and will not be liable to you or your owners for any debts, losses, or obligations your Center incurs, or to any of your creditors for any supplies, products, or other assets or services your Center purchases, while we (or the third party) manage it.

We (or a third party) may assume your Center's management under the following circumstances:  (1) if you abandon or fail actively to operate your Center; (2) if you fail to comply with any provision of this Agreement or any System Standard and do not cure the failure within the time period we specify in our notice to you; or (3) if this Agreement expires or is terminated and we are deciding whether to exercise our option to purchase your Center under Subsection 15.E. below.

If we exercise our rights under subparagraphs (1) or (2) above, that will not affect our right to terminate this Agreement under Subsection 14.B. above.

15.    **OUR AND YOUR RIGHTS AND OBLIGATIONS UPON TERMINATION OR EXPIRATION OF THIS AGREEMENT.**

A.     **PAYMENT OF AMOUNTS OWED TO US.**

You agree to pay us within fifteen (15) days after this Agreement expires or is terminated, or on any later date that we determine the amounts due to us, the Royalty, Marketing Fund contributions, interest, and all other amounts owed to us (and our affiliates) which then are unpaid.

B.     **DE-IDENTIFICATION.**

When this Agreement expires or is terminated for any reason:

(1)     you may not directly or indirectly at any time or in any manner (except with other Centers you own and operate) identify yourself or any business as a current or former Center or as one of our current or former franchise owners; use any Mark, any colorable imitation of a Mark, or other indicia of a Center in any manner or for any purpose; or use for any purpose any trade name, trade or service mark, or other commercial symbol that indicates or suggests a connection or association with us;

(2)     you agree to take the action required to cancel all fictitious or assumed name or equivalent registrations relating to your use of any Mark;

36

(3)     you agree to deliver to us, at your expense, within thirty (30) days all signs, sign-faces, sign-cabinets, marketing materials, forms, and other materials containing any Mark or otherwise identifying or relating to a Center that we request and allow us, without liability to you or third parties, to remove these items from your Center;

(4)     you agree to deliver to us within ten (10) days all customer lists of your Center;

(5)     if we do not have or do not exercise an option to purchase your Center under Subsection E below, you agree promptly and at your own expense to make the alterations we specify in our Operations Manuals (or otherwise) to distinguish your Center clearly from its former appearance and from other Centers in order to prevent public confusion;

(6)     you agree to notify the telephone company and all telephone directory publishers of the termination or expiration of your right to use any telephone, facsimile, or other numbers and telephone directory listings associated with any Mark; to authorize the transfer of these numbers and directory listings to us or, at our direction, to a third party; and/or to instruct the telephone company to forward all calls made to your numbers to numbers we specify.  If you fail to do so, we may take whatever action and sign whatever documents we deem appropriate on your behalf to effect these events; and

(7)     you agree to give us, within thirty (30) days after the expiration or termination of this Agreement, evidence satisfactory to us of your compliance with these obligations.

## C.  **CONFIDENTIAL INFORMATION.**

You agree that, when this Agreement expires or is terminated, you will immediately cease using any of our Confidential Information (including computer software or similar technology and digital passwords and identifications that we have licensed to you or that otherwise are proprietary to us or the Franchise System) in any business or otherwise and return to us all copies of the Operations Manuals and any other confidential materials that we have loaned you.

## D.  **COVENANT NOT TO COMPETE.**

Upon termination or expiration of this Agreement, you and your owners agree that, for two (2) years beginning on the effective date of termination or expiration or the date on which all persons restricted by this Subsection begin to comply with this Subsection, whichever is later, neither you nor any of your owners (or their immediate family members) will have any direct or indirect interest as an owner (whether of record, beneficially, or otherwise), investor, partner, director, officer, employee, consultant, representative, or agent in any Competitive Business (as defined in Section 7 above) located or operating:

(a)     Within a ten (10) mile radius of your Center;

ALLEGRA NETWORK 08/2005
–CHGO1:30557946.v2

(b)     within a five (5) mile radius of any other Center in operation or under construction on the later of the effective date of the termination or expiration of this Agreement or the date on which all persons restricted by this Subsection begin to comply with this Subsection.

These restrictions also apply after transfers, as provided in Section 12.C.(13) above. If any person restricted by this Subsection refuses voluntarily to comply with these obligations, the two (2) year period for that person will commence with the entry of a court order enforcing this provision. You and your owners expressly acknowledge that you possess skills and abilities of a general nature and have other opportunities for exploiting these skills. Consequently, our enforcing the covenants made in this Subsection will not deprive you of your personal goodwill or ability to earn a living.

E.   **OUR RIGHT TO PURCHASE YOUR CENTER.**

(1)     If you decide to transfer your Center and this Agreement, your Center's assets, or an ownership interest in you during this Agreement's term, the provisions of Section 12 generally will apply to the proposed transfer. However, upon

(a)     our termination of this Agreement according to its terms and conditions,

(b)     your termination of this Agreement without cause, or

(c)     expiration of this Agreement (if we offer, but you elect not to acquire, a successor franchise, or if we do not offer you a successor franchise due to your failure to satisfy the conditions for a successor franchise set forth in Section 13),

we have the option, exercisable by giving you written notice before or within thirty (30) days after the date of termination or expiration to purchase your Center. We have the unrestricted right to assign this option to purchase. We are entitled to all customary warranties and representations in our asset purchase, including, without limitation, representations and warranties as to ownership and condition of and title to assets; liens and encumbrances on assets; validity of contracts and agreements; and liabilities affecting the assets, contingent or otherwise. If we exercise our right to purchase your Center, you must assign your Lease for the Premises to us.

The purchase price for your Center will be its fair market value, provided that the fair market value will not include any value for (i) the Franchise or any rights granted by this Agreement; (ii) goodwill attributable to our Marks, brand image, and other intellectual property; or (iii) participation in the Franchise System. We may exclude from the assets purchased any Operating Assets or other items that are not reasonably necessary (in function or quality) to your Center's operation or that we have not approved as meeting System Standards for Centers, and the purchase price will reflect these exclusions.

If we and you cannot agree on fair market value, fair market value will be determined by one (1) independent accredited appraiser designated by us who will conduct an appraisal and, in doing so, be bound by the criteria specified herein. You and we agree to select the appraiser within fifteen (15) days after we notify you that we wish to exercise our purchase option (if you

38

and we have not agreed on fair market value before then). You and we will share equally the appraiser's fees and expenses. The appraiser must complete its appraisal within thirty (30) days after its appointment. The purchase price will be the appraised value.

We (or our assignee) will pay the purchase price at the closing, which will take place not later than sixty (60) days after the purchase price is determined. We may set off against the purchase price, and reduce the purchase price by, any and all amounts you or your owners owe us or our affiliates. At the closing, you agree to deliver instruments transferring to us (or our assignee):

> (a)    good and merchantable title to the assets purchased, free and clear of all liens and encumbrances (other than liens and security interests acceptable to us), with all sales and other transfer taxes paid by you;

> (b)    all of your Center's licenses and permits which may be assigned or transferred; and

> (c)    an assignment of the Lease.

You and your owners further agree to execute general releases, in a form satisfactory to us, of any and all claims against us and our shareholders, officers, directors, employees, agents, successors, and assigns. If we exercise our rights under this Subsection E, you and your owners agree that, for two (2) years beginning on the closing date, you and they will be bound by the non-competition covenant contained in Subsection 15.D. above.

### F.    CONTINUING OBLIGATIONS.

All of our and your (and your owners') obligations which expressly or by their nature survive this Agreement's expiration or termination will continue in full force and effect subsequent to and notwithstanding its expiration or termination and until they are satisfied in full or by their nature expire.

## 16.    RELATIONSHIP OF THE PARTIES/INDEMNIFICATION.

### A.    INDEPENDENT CONTRACTORS.

You and we understand and agree that this Agreement does not create a fiduciary relationship between you and us, that you and we are and will be independent contractors, and that nothing in this Agreement is intended to make either you or us a general or special agent, joint venturer, partner, or employee of the other for any purpose. You agree to identify yourself conspicuously in all dealings with customers, suppliers, public officials, Center personnel, and others as your Center's owner under a franchise we have granted and to place notices of independent ownership on the forms, business cards, stationery, advertising, and other materials we require from time to time.

You also acknowledge that you will have a contractual relationship only with us and may look only to us to perform under this Agreement. Holdings is not a party to this Agreement and has no obligations under it. You may not look to Holdings for performance. However, because

39

Holdings is the owner of the Marks, you and we agree that Holdings will be a third party beneficiary of those provisions in this Agreement relating to usage of the Marks, with the independent right to enforce such provisions against you and to seek damages from you for your failure to comply with those provisions.

### B.   NO LIABILITY FOR ACTS OF OTHER PARTY.

We and you may not make any express or implied agreements, warranties, guarantees, or representations, or incur any debt, in the name or on behalf of the other or represent that our respective relationship is other than franchisor and franchise owner. We will not be obligated for any damages to any person or property directly or indirectly arising out of your Center's operation or the business you conduct under this Agreement.

### C.   TAXES.

We will have no liability for any sales, use, service, occupation, excise, gross receipts, income, property, or other taxes, whether levied upon you or your Center, due to the business you conduct (except for our income taxes). You are responsible for paying these taxes and must reimburse us for any taxes that we must pay to any state taxing authority on account of your operation or payments that you make to us.

### D.   INDEMNIFICATION.

You agree to indemnify, defend, and hold harmless us, our affiliates, and our and their respective shareholders, members, directors, officers, employees, agents, successors, and assignees (the "Indemnified Parties") against, and to reimburse any one or more of the Indemnified Parties for, all claims, obligations, and damages directly or indirectly arising out of your Center's operation, the business you conduct under this Agreement, or your breach of this Agreement, including, without limitation, those alleged to be caused by the Indemnified Party's negligence, unless (and then only to the extent that) the claims, obligations, or damages are determined to be caused solely by our gross negligence or willful misconduct in a final, unappealable ruling issued by a court with competent jurisdiction. For purposes of this indemnification, "claims" include all obligations, damages (actual, consequential, or otherwise), and costs that any Indemnified Party reasonably incurs in defending any claim against it, including, without limitation, reasonable accountants', arbitrators', attorneys', and expert witness fees, costs of investigation and proof of facts, court costs, travel and living expenses, and other expenses of litigation, arbitration, or alternative dispute resolution, regardless of whether litigation, arbitration, or alternative dispute resolution is commenced. Each Indemnified Party may defend any claim against it at your expense and agree to settlements or take any other remedial, corrective, or other actions. This indemnity will continue in full force and effect subsequent to and notwithstanding this Agreement's expiration or termination. An Indemnified Party need not seek recovery from any insurer or other third party, or otherwise mitigate its losses and expenses, in order to maintain and recover fully a claim against you under this subparagraph. You agree that a failure to pursue a recovery or mitigate a loss will not reduce or alter the amounts that an Indemnified Party may recover from you under this subparagraph.

40

17.   **ENFORCEMENT.**

    A.   **SECURITY INTEREST.**

      As security for the performance of your obligations under this Agreement, including payments owed to us for purchase by you, you grant us a security interest in all of the assets of your Center, including but not limited to inventory, fixtures, furniture, equipment, accounts, supplies, contracts, and proceeds and products of all those assets. You agree to execute such other documents as we may reasonably request in order to further document, perfect and record our security interest. If you default in any of your obligations under this Agreement, we may exercise all rights of a secured creditor granted to us by law, in addition to our other rights under this Agreement and at law. If a third party lender requires that we subordinate our security interest in the assets of your Center as a condition to lending you working capital for the operation of your Center, we will agree to subordinate pursuant to terms and conditions determined by us.

    B.   **SEVERABILITY AND SUBSTITUTION OF VALID PROVISIONS.**

      Except as expressly provided to the contrary in this Agreement, each section, paragraph, term, and provision of this Agreement is severable, and if, for any reason, any part is held to be invalid or contrary to or in conflict with any applicable present or future law or regulation in a final, unappealable ruling issued by any court, agency, or tribunal with competent jurisdiction, that ruling will not impair the operation of, or otherwise affect, any other portions of this Agreement, which will continue to have full force and effect and bind the parties.

      If any covenant which restricts competitive activity is deemed unenforceable by virtue of its scope in terms of area, business activity prohibited, and/or length of time, but would be enforceable if modified, you and we agree that the covenant will be enforced to the fullest extent permissible under the laws and public policies applied in the jurisdiction whose law determines the covenant's validity.

      If any applicable and binding law or rule of any jurisdiction requires more notice than this Agreement requires of this Agreement's termination or of our refusal to enter into a successor franchise agreement, or some other action that this Agreement does not require, or if, under any applicable and binding law or rule of any jurisdiction, any provision of this Agreement or any System Standard is invalid, unenforceable, or unlawful, the notice and/or other action required by the law or rule will be substituted for the comparable provisions of this Agreement, and we may modify the invalid or unenforceable provision or System Standard to the extent required to be valid and enforceable or delete the unlawful provision in its entirety. You agree to be bound by any promise or covenant imposing the maximum duty the law permits which is subsumed within any provision of this Agreement, as though it were separately articulated in and made a part of this Agreement.

    C.   **WAIVER OF OBLIGATIONS.**

      We and you may by written instrument unilaterally waive or reduce any obligation of or restriction upon the other under this Agreement, effective upon delivery of written notice to the other or another effective date stated in the notice of waiver. Any waiver granted will be without

41

prejudice to any other rights we or you have, will be subject to continuing review, and may be revoked at any time and for any reason effective upon delivery of ten (10) days' prior written notice.

We and you will not waive or impair any right, power, or option this Agreement reserves (including, without limitation, our right to demand exact compliance with every term, condition, and covenant or to declare any breach to be a default and to terminate this Agreement before its term expires) because of any custom or practice at variance with this Agreement's terms; our or your failure, refusal, or neglect to exercise any right under this Agreement or to insist upon the other's compliance with this Agreement, including, without limitation, any System Standard; our waiver of or failure to exercise any right, power, or option, whether of the same, similar, or different nature, with other Centers; the existence of franchise agreements for other Centers which contain provisions different from those contained in this Agreement; or our acceptance of any payments due from you after any breach of this Agreement. No special or restrictive legend or endorsement on any check or similar item given to us will be a waiver, compromise, settlement, or accord and satisfaction. We are authorized to remove any legend or endorsement, which then will have no effect.

Neither we nor you will be liable for loss or damage or be in breach of this Agreement if our or your failure to perform our or your obligations results from: (1) compliance with the orders, requests, regulations, or recommendations of any federal, state, or municipal government; (2) acts of God; (3) fires, strikes, embargoes, war, acts of terrorism or similar events, or riot; or (4) any other similar event or cause. Any delay resulting from any of these causes will extend performance accordingly or excuse performance, in whole or in part, as may be reasonable, except that these causes will not excuse payments of amounts owed at the time of the occurrence or payment of the Royalty or Marketing Fund and cooperative advertising contributions due afterward.

D.    **COSTS AND ATTORNEYS' FEES.**

If either party initiates an arbitration, judicial or other proceeding and we prevail, we will be entitled to reasonable costs and expenses (including attorneys' fees incurred in connection with such arbitration, judicial or other proceeding).

E.    **YOU MAY NOT WITHHOLD PAYMENTS DUE TO US.**

You agree that you will not withhold payment of any amounts owed to us on the grounds of our alleged nonperformance of any of our obligations under this Agreement or for any other reason, and you specifically waive any right you may have at law or in equity to offset any funds you may owe us or to fail or refuse to perform any of your obligations under this Agreement. You agree to submit all claims, unless otherwise resolved by our and your mutual agreement, to arbitration as provided in Subsection G below.

F.    **RIGHTS OF PARTIES ARE CUMULATIVE.**

Our and your rights under this Agreement are cumulative, and our or your exercise or enforcement of any right or remedy under this Agreement will not preclude our or your exercise or enforcement of any other right or remedy which we or you are entitled by law to enforce.

42

G.    **ARBITRATION.**

We and you agree that, except for controversies, disputes, or claims related to or based on improper use of the Marks or Confidential Information, all controversies, disputes, or claims between us and our affiliates, and our and their respective shareholders, members, officers, directors, agents, and/or employees, and you (and/or your owners, guarantors, affiliates, and/or employees) arising out of or related to:

(1)    this Agreement or any other agreement between you and us;

(2)    our relationship with you;

(3)    the validity of this Agreement or any other agreement between you and us; or

(4)    any System Standard;

must be submitted for binding arbitration, on demand of either party, to the American Arbitration Association in the United States ("AAA"). The arbitration proceedings will be conducted by one arbitrator and, except as this Subsection otherwise provides, according to the AAA's then current rules. All proceedings will be conducted at a suitable location chosen by the arbitrator which is within a fifty (50) mile radius of our then current principal place of business. All matters relating to arbitration will be governed by the United States Federal Arbitration Act (9 U.S.C. §§ 1 et seq.).   Judgment upon the arbitrator's award may be entered in any court of competent jurisdiction.

The arbitrator has the right to award or include in his or her award any relief which he or she deems proper, including, without limitation, money damages (with interest on unpaid amounts from the date due), specific performance, injunctive relief, and attorneys' fees and costs (as allowable under this Agreement or applicable law), provided that the arbitrator may not declare any Mark generic or otherwise invalid or, except as expressly provided in Subsection 17.J. below, award any punitive, exemplary or multiple damages against either party (we and you hereby waiving to the fullest extent permitted by law, except as expressly provided in Subsection 17.J. below, any right to or claim for any punitive, exemplary or multiple damages against the other).

We and you agree to be bound by the provisions of any limitation on the period of time in which claims must be brought under applicable law or this Agreement, whichever expires earlier. We and you further agree that, in any arbitration proceeding, each must submit or file any claim which would constitute a compulsory counterclaim (as defined by Rule 13 of the United States Federal Rules of Civil Procedure) within the same proceeding as the claim to which it relates. Any claim which is not submitted or filed as required is forever barred. The arbitrator may not consider any settlement discussions or offers that might have been made by either you or us.

We and you agree that arbitration will be conducted on an individual, not a class-wide, basis and that an arbitration proceeding between us and our affiliates, and our and their respective shareholders, officers, directors, agents, and/or employees, and you (and/or your

43

owners, guarantors, affiliates, and/or employees) may not be consolidated with any other arbitration proceeding between us and any other person.

Despite our and your agreement to arbitrate, we and you each have the right in a proper case to seek temporary restraining orders and temporary or preliminary injunctive relief from a court of competent jurisdiction; provided, however, that we and you must contemporaneously submit our dispute for arbitration on the merits as provided in this Subsection.

The provisions of this Subsection are intended to benefit and bind certain third party non-signatories and will continue in full force and effect subsequent to and notwithstanding this Agreement's expiration or termination.

H.  **GOVERNING LAW.**

ALL MATTERS RELATING TO ARBITRATION WILL BE GOVERNED BY THE UNITED STATES FEDERAL ARBITRATION ACT (9 U.S.C. §§ 1 ET SEQ.). EXCEPT TO THE EXTENT GOVERNED BY THE FEDERAL ARBITRATION ACT, THE UNITED STATES TRADEMARK ACT OF 1946 (LANHAM ACT, 15 U.S.C. SECTIONS 1051 ET SEQ.), OR OTHER UNITED STATES FEDERAL LAW, THIS AGREEMENT, THE FRANCHISE, AND ALL CLAIMS ARISING FROM THE RELATIONSHIP BETWEEN US AND YOU WILL BE GOVERNED BY THE LAWS OF THE STATE OF MICHIGAN WITHOUT REGARD TO ITS CONFLICT OF LAWS RULES, EXCEPT THAT ANY STATE LAW REGULATING THE SALE OF FRANCHISES OR GOVERNING THE RELATIONSHIP OF A FRANCHISOR AND ITS FRANCHISEE WILL NOT APPLY UNLESS ITS JURISDICTIONAL REQUIREMENTS ARE MET INDEPENDENTLY WITHOUT REFERENCE TO THIS PARAGRAPH.

I.  **CONSENT TO JURISDICTION.**

SUBJECT TO SUBSECTION 17.G. ABOVE AND THE PROVISIONS BELOW, YOU AND YOUR OWNERS AGREE THAT ALL ACTIONS ARISING UNDER THIS AGREEMENT OR OTHERWISE AS A RESULT OF THE RELATIONSHIP BETWEEN YOU AND US MUST BE COMMENCED IN A COURT OF GENERAL JURISDICTION NEAREST TO OUR THEN CURRENT PRINCIPAL PLACE OF BUSINESS (CURRENTLY NORTHVILLE, MICHIGAN), AND YOU (AND EACH OWNER) IRREVOCABLY SUBMIT TO THE JURISDICTION OF THAT COURT AND WAIVE ANY OBJECTION YOU (OR THE OWNER) MIGHT HAVE TO EITHER THE JURISDICTION OF OR VENUE IN THAT COURT.

J.  **WAIVER OF PUNITIVE DAMAGES AND JURY TRIAL.**

EXCEPT FOR YOUR OBLIGATION TO INDEMNIFY US FOR THIRD PARTY CLAIMS UNDER SUBSECTION 16.D., AND EXCEPT FOR PUNITIVE, EXEMPLARY OR MULTIPLE DAMAGES AVAILABLE TO EITHER PARTY UNDER UNITED STATES FEDERAL LAW, WE AND YOU (AND YOUR OWNERS) WAIVE TO THE FULLEST EXTENT PERMITTED BY LAW ANY RIGHT TO OR CLAIM FOR ANY PUNITIVE, EXEMPLARY OR MULTIPLE DAMAGES AGAINST THE OTHER AND AGREE THAT, IN THE EVENT OF A DISPUTE BETWEEN US AND YOU, THE

44

PARTY MAKING A CLAIM WILL BE LIMITED TO EQUITABLE RELIEF AND TO RECOVERY OF ANY ACTUAL DAMAGES IT SUSTAINS.

WE AND YOU IRREVOCABLY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM, WHETHER AT LAW OR IN EQUITY, BROUGHT BY EITHER OF US.

K.   **INJUNCTIVE RELIEF.**

Nothing in this Agreement bars our right to obtain specific performance of the provisions of this Agreement and injunctive relief against threatened conduct that will cause us, the Marks and/or the Franchise System loss or damage, under customary equity rules, including applicable rules for obtaining restraining orders and preliminary injunctions (subject to our obligation to arbitrate the underlying claim if required by Section 17.G). You agree that we may obtain such injunctive relief in addition to such further or other relief as may be available at law or in equity. You agree that we will not be required to post a bond to obtain injunctive relief and that your only remedy if an injunction is entered against you will be the dissolution of that injunction, if warranted, upon due hearing (all claims for damages by injunction being expressly waived hereby).

L.   **BINDING EFFECT.**

This Agreement is binding upon us and you and our and your respective executors, administrators, heirs, beneficiaries, permitted assigns, and successors in interest. Subject to our right to modify the Operations Manuals and System Standards, this Agreement may not be modified except by a written agreement signed by our and your duly-authorized officers.

M.   **LIMITATIONS OF CLAIMS.**

Except for claims arising from your non-payment or underpayment of amounts you owe us or our affiliate, any and all claims arising out of or relating to this Agreement or our relationship with you will be barred unless a judicial or arbitration proceeding is commenced within one (1) year from the date on which the party asserting the claim knew or should have known of the facts giving rise to the claims.

N.   **CONSTRUCTION.**

The preambles and exhibits are a part of this Agreement which, together with the System Standards contained in the Operations Manuals (which may be periodically modified, as provided in Sections 4.C., 8.G., and 17.L. above), constitutes our and your entire agreement, and there are no other oral or written understandings or agreements between us and you, or oral or written representations by us, relating to the subject matter of this Agreement, the franchise relationship, or your Center (any understandings or agreements reached, or any representations made, before this Agreement are superseded by this Agreement). Any policies that we adopt and implement from time to time to guide us in our decision-making are subject to change, are not a part of this Agreement, and are not binding on us. Except as provided in Subsections 16.D. and 17.G., nothing in this Agreement is intended or deemed to confer any rights or remedies upon any person or legal entity not a party to this Agreement.

45

Except where this Agreement expressly obligates us reasonably to approve or not unreasonably to withhold our approval of any of your actions or requests, we have the absolute right to refuse any request you make or to withhold our approval of any of your proposed, initiated, or completed actions that require our approval. The headings of the sections and paragraphs are for convenience only and do not define, limit, or construe the contents of these sections or paragraphs.

References in this Agreement to "we," "us," and "our," with respect to all of our rights and all of your obligations to us under this Agreement, include any of our affiliates with whom you deal. The term "affiliate" means any person or entity directly or indirectly owned or controlled by, under common control with, or owning or controlling you or us. "Control" means the power to direct or cause the direction of management and policies.

If two or more persons are at any time the owners of the Franchise and your Center, whether as partners or joint venturers, their obligations and liabilities to us will be joint and several. References to "owner" mean any person holding a direct or indirect ownership interest (whether of record, beneficially, or otherwise) or voting rights in you (or a transferee of this Agreement and your Center or an ownership interest in you), including, without limitation, any person who has a direct or indirect interest in you (or a transferee), this Agreement, the Franchise, or your Center and any person who has any other legal or equitable interest, or the power to vest in himself or herself any legal or equitable interest, in their revenue, profits, rights, or assets. References to a "controlling ownership interest" in you or one of your owners (if an Entity) mean the percent of the voting shares or other voting rights that results from dividing one hundred percent (100%) of the ownership interests by the number of owners. In the case of a proposed transfer of an ownership interest in you or one of your owners, the determination of whether a "controlling ownership interest" is involved must be made as of both immediately before and immediately after the proposed transfer to see if a "controlling ownership interest" will be transferred (because of the number of owners before the proposed transfer) or will be deemed to have been transferred (because of the number of owners after the proposed transfer). "Person" means any natural person, corporation, limited liability company, general or limited partnership, unincorporated association, cooperative, or other legal or functional entity. Unless otherwise specified, all references to a number of days shall mean calendar days and not business days.

The term "your Center" includes all of the assets of the Center you operate under this Agreement, including its revenue and the Lease.

This Agreement may be executed in multiple copies, each of which will be deemed an original.

18.   **NOTICES AND PAYMENTS.**

All written notices, reports, and payments permitted or required to be delivered by this Agreement or the Operations Manuals will be deemed to be delivered:

      (a)    at the time delivered by hand;

ALLEGRA NETWORK 08/2005
~CHGO1:30557946.v2

(b)     at the time delivered via computer transmission and, in the case of the Royalty, Marketing Fund contributions, and other amounts due, at the time we actually receive payment;

(c)     one (1) business day after transmission by facsimile or other electronic system if the sender has confirmation of successful transmission;

(d)     one (1) business day after being placed in the hands of a nationally recognized commercial courier service for next business day delivery; or

(e)     three (3) business days after placement in the United States Mail by Registered or Certified Mail, Return Receipt Requested, postage prepaid;

(f)     and must be addressed to the party to be notified at its most current principal business address of which the notifying party has notice.  Any required payment or report which we do not actually receive during regular business hours on the date due (or postmarked by postal authorities at least two (2) days before then) will be deemed delinquent.

## 19.   **ELECTRONIC MAIL**

You acknowledge and agree that exchanging information with us by e-mail is efficient and desirable for day-to-day communications and that we and you may utilize e-mail for such communications.  You authorize the transmission of e-mail by us and our employees, vendors, and affiliates ("Official Senders") to you during the term of this Agreement.

You further agree that: (a) Official Senders are authorized to send e-mails to those of your employees as you may occasionally authorize for the purpose of communicating with us; (b) you will cause your officers, directors and employees to give their consent to Official Senders' transmission of e-mails to them; (c) you will require such persons not to opt out or otherwise ask to no longer receive e-mails from Official Senders during the time that such person works for or is affiliated with you; and (d) you will not opt out or otherwise ask to no longer receive e-mails from Official Senders during the term of this Agreement.

This consent given in this Section 19 shall not apply to the provision of notice by either party under this Agreement pursuant to Section 18 unless we and you otherwise agree in a written document manually signed by both parties.

ALLEGRA NETWORK 08/2005
~CHGO1:3055 7946.v2

**IN WITNESS WHEREOF**, the parties have executed and delivered this Agreement on the dates noted below, to be effective as of the Effective Date.

**ALLEGRA NETWORK LLC**, a Michigan limited liability company

By:     William D. McIntyre, Jr.
Its:     Chief Executive Officer

DATED:   **21· NOV· 05**

**MICHAEL J. REEDER AND JEFFREY L. REEDER**

Michael J. Reeder, Individually

Jeffery L. Reeder, Individually

DATED:   11/14/2005

## EXHIBIT A

### TO THE FRANCHISE AGREEMENT
### BETWEEN ALLEGRA NETWORK LLC
### AND MICHAEL J. REEDER AND JEFFERY L. REEDER
### DATED _November 14th_, 200_5_

### PREMISES

1850 M Street N.W.
Washington, D.C. 20036

49

## EXHIBIT B

**TO THE FRANCHISE AGREEMENT
BETWEEN ALLEGRA NETWORK LLC
AND MICHAEL J. REEDER AND JEFFERY L. REEDER
DATED _November 14th_, 200_5_**

## EXCLUSIVE TERRITORY

**Two mile radius of the Premises.**

## EXHIBIT C

### TO THE FRANCHISE AGREEMENT
### BETWEEN ALLEGRA NETWORK LLC AND MICHAEL J. REEDER AND JEFFERY
### L. REEDER

DATED _November 14th_, 2005

## EXHIBIT C

### TO THE FRANCHISE AGREEMENT
### BETWEEN ALLEGRA NETWORK LLC
### AND MICHAEL J. REEDER AND JEFFERY L. REEDER
### DATED _November 14th_, 200 _5_

**Effective Date:  This Exhibit C is current and complete
as of _____, 200__**

### You and Your Owners

1.   **Form of Owner**.

   (a)    **Individual Proprietorship**.  Your owner(s) (is) (are) as follows:

   _____

   _____

   _____

   (b)    **Corporation, Limited Liability Company, or Partnership**.  You were incorporated or formed on ___ _October 1993_ ___, under the laws of the State of ___ _Virginia_ ___.  You have not conducted business under any name other than your corporate, limited liability company, or partnership name and ___ _Point House Bypass Insty-Prints_ ___.  The following is a list of your directors, if applicable, and officers as of the effective date shown above:

| Name of Each Director/Officer | Position(s) Held |
|---|---|
| _Jeff Reader_ | _Vice President_ |
| _Mike Reeder_ | _President_ |
| | |
| | |
| | |

2.    **Owners**.  The following list includes the full name of each person who is one of your owners (as defined in the Franchise Agreement), or an owner of one of your owners, and fully describes the nature of each owner's interest (attach additional pages if necessary).

| Owner's Name | Description of Interest |
|---|---|
| (a) _Jeff Reeder_ | 50 % |
| (b) _Mike Reeder_ | 50% |
| (c) | |
| (d) | |

3. **Managing Owner**. The Managing Owner is _____.

ALLEGRA NETWORK LLC,
a Michigan limited liability company

By: _William D. McIntyre, Jr._
Its: Chief Executive Officer

DATED: _21-NOV-05_

MICHAEL J. REEDER AND JEFFERY
L. REEDER

_____
Michael J. Reeder, Individually

_____
Jeffrey L. Reeder, Individually

DATED: _11/14/2005_

2

## EXHIBIT D

### TO THE FRANCHISE AGREEMENT
### BETWEEN ALLEGRA NETWORK LLC
### AND MICHAEL J. REEDER AND JEFFERY L. REEDER
### DATED November 14th, 2005

### ALLEGRA AND AMERICAN SPEEDY RIDER

# ALLEGRA NETWORK LLC

## ALLEGRA AND AMERICAN SPEEDY RIDER
## TO FRANCHISE AGREEMENT

1.   **BACKGROUND.**   This Allegra and American Speedy Rider (this "Rider") is made and entered into as of _November 14th_, 2005 between Allegra Network LLC ("we," "us," or "our") and Michael J. Reeder and Jeffery L. Reeder ("you" or "your").  This Rider is attached to, and intended to be part of, the Franchise Agreement that we and you executed concurrently herewith (the "Franchise Agreement") for the operation of an [X] Allegra Print & Imaging Center or [  ] American Speedy Printing Center located at 1850 M Street N.W., Washington, D.C. 20036.  This Rider modifies the Franchise Agreement to the extent necessary to reflect your operation of an Allegra Print & Imaging Center or American Speedy Printing Center.  All capitalized terms used but not defined in this Rider have the meanings set forth in the Franchise Agreement.  Except as provided in this Rider, the Franchise Agreement remains in full force and effect as originally written.  If there is any inconsistency between the Franchise Agreement and this Rider, the terms of this Rider will control.

2.   **ROYALTY.**

2.1   **ROYALTY AND DATE OF PAYMENT**

You agree to pay us a monthly Royalty of 6% of Total Monthly Receipts (as defined below) not to exceed $65,330 (as adjusted from time to time by us to reflect any changes in the Consumer Price Index, as defined below) per annum, commencing the first month of operation and continuing thereafter until the expiration of the term of the Franchise Agreement. Royalty payments are payable to us on or before the 20th day of each month based on the previous month's Total Monthly Receipts.

2.2   **TOTAL MONTHLY RECEIPTS**

"Total Monthly Receipts" mean all receipts from all of your sales conducted at, from or through your Center, including amounts received from the sale of services and products of every kind and nature.  It excludes all taxes imposed by any federal, state, municipal or other governmental authority directly on sales and collected from customers so long as it is added to the selling price and actually paid by you to such governmental authority.  It also excludes all amounts paid by customers for postage and customer refunds or credits.  Total Monthly Receipts do not include sales made on credit during the month if you are not paid in that month but do include collections on credit sales made in a previous month.

2.3   **ROYALTY REBATE**

If you are in compliance with all the terms and conditions of the Franchise Agreement, you are eligible to receive a rebate of Royalty payments ("Rebate").  The Rebate applies only to Royalty payments and does not apply to the Allegra Marketing Fund or to the Local Advertising Cooperative contributions.  The amount of Rebate on Royalty payments due each month (based on the previous month's Total Monthly Receipts) will be a percentage of such Royalty payments.  Such percentage will be determined by the average Total Monthly Receipts of the three immediately preceding months, as set forth in the table below.  If you are entitled to a Rebate, the amount of Payments we electronically transfer from your bank account on the 20th of each month, or the subsequent business day if the 20th is a national holiday or a weekend, will be net of the amount of Rebate to which you are entitled under this Section. If the Payments are electronically

transferred after the 20th day of each month because of insufficient funds in your checking account, the Payments shall not include any applicable Rebate.

The following table of Rebate percentages applies as of the date of the Franchise Agreement. However, we reserve the right to adjust annually the average Total Monthly Receipts figures to reflect or account for increases in the previous year, by using the most recently published National Consumer Price Index-All Urban Consumers-All Items (1982-1984 = 100) as mostly recently published by the U.S. Department of Labor or similar index if the former is no longer in use at the time of adjustment to account for inflationary trends ("Consumer Price Index"). Any such increase will be uniform to all *Allegra* and *American Speedy* franchisees.

| Average Total Monthly Receipts – Net of Sales Tax | Rebate % | Effective Royalty % After Rebate |
|---|---|---|
| $0 - $22,320 | 0% | 6.0% |
| $22,321 - $37,195 | 10% | 5.4% |
| $37,196 - $72,425 | 20% | 4.8% |
| $72,426 - $108,630 | 30% | 4.2% |
| $108,631 and above | 40% | 3.6% |

3. **MARKETING FUND CONTRIBUTION**

You agree to pay us a Marketing Fund contribution of 1% of your Total Monthly Receipts, not to exceed $6,540 (as adjusted from time to time by us to reflect any changes in the Consumer Price Index) per annum, payable on the 20th day of the calendar month following the calendar month in which such Total Monthly Receipts are received. We reserve the right to raise the amount of the Marketing Fund contribution, not to exceed 3% of your Total Monthly Receipts, with the consent of franchisees paying a majority of Marketing Fund contributions.

4. **LOCAL ADVERTISING COOPERATIVE CONTRIBUTION**

If we establish a Local Advertising Cooperative in your geographic area pursuant to Section 9.C of the Franchise Agreement, you agree to pay us a monthly Local Advertising Cooperative contribution of 1% of the Total Monthly Receipts on or before the twentieth (20th) day of each month for the immediately preceding month.

[Remainder of this Page Intentionally Left Blank]

**IN WITNESS WHEREOF,** the parties have executed and delivered this Rider effective on the date first above written.

**ALLEGRA NETWORK LLC**
a Michigan limited liability company

By:   William D. McIntyre, Jr.
Its:   Chief Executive Officer

**MICHAEL J. REEDER AND JEFFERY L. REEDER**

Michael J. Reeder, Individually

Jeffery L. Reeder, Individually

## EXHIBIT E

### TO THE FRANCHISE AGREEMENT
### BETWEEN ALLEGRA NETWORK LLC
### AND _____
### DATED _____, 200__

### INSTY-PRINTS RIDER

### NOT APPLICABLE

## ADDENDUM TO FRANCHISE AGREEMENT

This Addendum ("Addendum") is entered into on _November 14th_, 2005, by and between Allegra Network LLC, a Michigan limited liability company ("Franchisor") and Michael J. Reeder and Jeffery L. Reeder (together referred to herein as "Franchisee"). In this Addendum, we refer to Franchisor as "we" or "us" and we refer to Franchisee as "you." This Addendum is incorporated by reference into that certain Franchise Agreement of even date herewith between Franchisor and Franchisee (the "Franchise Agreement") and is intended to modify or supplement certain provisions of the Franchise Agreement. All capitalized terms used but not defined in this Addendum shall have the meanings set forth in the Franchise Agreement. If there is any inconsistency between the Franchise Agreement and this Addendum, the terms of this Addendum will control.   All terms of the Franchise Agreement not changed by this Addendum shall continue in force unchanged.

1.    **Center Development**.  Section 2.D. of the Franchise Agreement is deleted and replace with the following:

You acknowledge and agree that you have entered into the Franchise Agreement to operate an Allegra Print & Imaging Center under the name *Allegra®* Print & Imaging, and to use the Franchise System in its operation, for a term beginning on the Effective Date and expiring September 23, 2013 ("Term"), unless sooner terminated under Section 14.  However, you have not completed the conversion of your Insty-Prints Center to an Allegra Print & Imaging Center as of the date hereof.  You agree to complete such conversion by following the plans and specifications we provide you for Allegra Print & Imaging Centers and purchasing and installing, if necessary, all required equipment (including the Computer System as defined in Section 2.E below), furniture, fixtures and signs (collectively, the "Operating Assets") for Allegra Print & Imaging Centers.  The parties agree to execute Exhibit A attached hereto as soon as the parties agree upon date on which such conversion will be completed (the "Conversion Date").

2.    **Royalty and Marketing Fund Contributions**.   Notwithstanding anything contained to the contrary contained in the Allegra and American Speedy Rider to Franchise Agreement that you and we executed simultaneously herewith (the "Allegra and American Speedy Rider"), you and we agree that Royalty and Marketing Fund provisions attached hereto as Exhibit B shall apply to you until the Conversion Date. As of the Conversion Date, however, the provisions of Exhibit B attached shall automatically become null and void and the terms of the Allegra and American Speedy Rider to Franchise Agreement shall apply for the remaining term of the Franchise Agreement.

3.    **Center Opening**. Subsection 2.G. of the Franchise Agreement is deleted.

4.    **Initial Fee**. Section 3.A of the Franchise Agreement is deleted.

5.    **Training**. The first four paragraphs of Section 4.A. of the Franchise Agreement are deleted.

The parties to this Addendum execute and deliver this Addendum in multiple counterparts as to the date written below.

**FRANCHISOR:**
Allegra Network LLC
a Michigan limited liability company

By:      William D. McIntyre, Jr.
Its:      Chief Executive Officer

**FRANCHISEE:**
Michael J. Reeder and Jeffery L. Reeder

Michael J. Reeder, Individually

Jeffery L. Reeder, Individually

2

## EXHIBIT A

## CONVERSION DATE

The parties agree that the Conversion Date is _November 14th_____, 2005 and that, as of such date, the Center will operate as an Allegra Print & Imaging Center.


**FRANCHISOR:**
Allegra Network LLC
a Michigan limited liability company


By:    William D. McIntyre, Jr.
Its:    Chief Executive Officer

**FRANCHISEE:**
Michael J. Reeder and Jeffery L. Reeder


Michael J. Reeder, Individually


Jeffery L. Reeder, Individually

3

## EXHIBIT A

## CONVERSION DATE

The parties agree that the Conversion Date is ___January 1 2006___, 2006 and that, as of such date, the Center will operate as an Allegra Print & Imaging Center.

**FRANCHISOR:**
Allegra Network LLC
a Michigan limited liability company

By:    William D. McIntyre, Jr.
Its:   Chief Executive Officer

**FRANCHISEE:**
Michael J. Reeder and Jeffery L. Reeder

Michael J. Reeder, Individually

Jeffery L. Reeder, Individually

3

## EXHIBIT B

## CONVERSION PERIOD ROYALTY AND MARKETING FUND PAYMENTS

Until the Conversion Date, the parties agree that the following provisions will apply to your Center in lieu of the Royalty and Marketing Fund provisions under the Allegra and American Speedy Rider:

1. **ROYALTY.**

   1.1 **ROYALTY AND DATE OF PAYMENT**

   You agree to pay us a monthly Royalty on or before the twentieth (20th) day of each month. Your Royalty will be an amount equal to a percentage of Gross Sales (as defined below) for the immediately preceding month, based on the following schedule:

   | Amount of Gross Sales During the Calendar Year | Royalty % |
   |---|---|
   | $0 - $1,017,710 | 4.5% |
   | $1,017,711 - $1,908,055 | 3% |
   | Over $1,908,056 | 2% |

   Gross Sales ranges provided above are applicable as of the date of the Franchise Agreement. However, we reserve the right to adjust annually the Gross Sales figures to reflect or account for increases in the previous year, by using the most recently published National Consumer Price Index-All Urban Consumers-All Items (1982-1984 = 100) as mostly recently published by the U.S. Department of Labor or similar index if the former is no longer in use at the time of adjustment to account for inflationary trends ("Consumer Price Index"). Any such increase will be uniform to all *Insty-Prints* franchisees and we will notify you in writing on or before March 15 of each calendar year as to any changes in the Gross Sales ranges for that calendar year.

   1.2 **GROSS SALES**

   "Gross Sales" means all revenue from sales conducted at, from or through your Center, including amounts received from the sale of services and products of every kind and nature. It excludes all taxes imposed by any federal, state, municipal or other governmental authority so long as it is added to the selling price and actually paid by you to such governmental authority. It also excludes all amounts paid by customers for postage and customer refunds or credits.

4

## 2. MARKETING FUND CONTRIBUTION

You agree to pay us a monthly Marketing Fund contribution of 2% of the Gross Sales on or before the twentieth (20th) of each month for the immediately preceding month. If the Gross Sales for your Center exceed $821,355 during any calendar year, you will not be required to pay the Marketing Fund assessment for the remainder of such calendar year. We reserve the right to adjust annually the Gross Sales level to reflect or account for increases in the previous year, by using the Consumer Price Index. Any such increase will be uniform to all franchisees contributing to the Insty-Prints Marketing Fund and we will notify you in writing on or before March 15 of each calendar year as to any changes in the Gross Sales level for that calendar year.

FRANCHISOR:
Allegra Network LLC
a Michigan limited liability company


By:     William D. McIntyre, Jr.
Its:    Chief Executive Officer

FRANCHISEE:
Michael J. Reeder and Jeffery L. Reeder


Michael J. Reeder, Individually


Jeffery L. Reeder, Individually



**ALLEGRA**
N E T W O R K

## ELECTRONIC FUNDS TRANSFER AUTHORIZATION

Michael J. Reeder and Jeffery L. Reeder ("Franchisee") authorizes Allegra Network LLC ("Allegra") to deduct electronically from account number _15 74 306146_ ("Account") with___ _Chevy Chase Bank_____ ("Financial Institution") the monthly royalty payments and any applicable national marketing fund assessments and local advertising cooperative fees ("Payments") as such Payments become due under the Franchise Agreement between Allegra and Franchisee.

This Authorization shall continue in effect until terminated upon ten (10) days prior written notice to Allegra. The Payments will be electronically transferred monthly from the Account on the 20th day of each month or the next subsequent business day if the 20th is a national holiday or a weekend. If the Payments are electronically transferred after the 20th day of each month because of insufficient funds in the account, the Payments shall not include any applicable rebate. In conjunction with the execution of this Authorization, **Franchisee shall provide Allegra with a voided check in order to verify the Account information.**

In addition, Franchisee authorizes and requests the Financial Institution to accept Allegra's requests for the Payments and to deduct such Payments from the Account without responsibility for the correctness or accuracy of the Payments.

**FRANCHISEE:**
**MICHAEL J. REEDER AND JEFFERY L. REEDER**

_____
Michael J. Reeder, Individually

_____
Jeffery L. Reeder, Individually

Dated: ___11/14/2005_____

21680 HAGGERTY ROAD · NORTHVILLE, MICHIGAN 48167
TELEPHONE 248.596.8600   FAX 248.596.8601
www.allegranetwork.com